# SANDERS v. SANDERS *et al.*

No. 909.   Opinion Filed March 9, 1909.

Rehearing Denied January 24, 1911.

1.   INDIANS—Allotments—Descent and Distribution. A citizen of the Creek Nation in possession of lands in said Nation who files thereon before the Commission to the Five Civilized Tribes under an Act of Congress approved June 28, 1898, and dies April 28, 1900, without receiving her certificate of allotment therefor is seized of no estate of inheritance and courtesy therein does not attach.

2.   SAME. The allotment of a citizen of the Creek Nation set apart to her under an Act of Congress approved June 28, 1898, who dies in possession thereof prior to an act of Congress approved March 1, 1901, without receiving her certificate of allotment therefor, is distributable to her heirs under patent therefor to them subsequently issued according to the laws of descent and distribution of the Creek Nation as provided in sections 6 and 7 of the act last aforesaid.

3.   SAME—Rights of Surviving Non-Citizen Husband. The surviving non-citizen husband of a citizen of the Creek Nation who dies in possession of her allotment, set apart to her under an Act of Congress approved June 28, 1898, prior to her certificate of allotment therefor, under the laws of descent and distribution of the Creek Nation, is an heir to his deceased wife and as such entitled to a "child's part" and to share and share alike therein with the children of his said wife her surviving whether they take by descent or by purchase.

4.   INDIANS—Allotments—Deeds—Validity. A deed to an undivided interest in the allotment of a citizen of the Creek Nation, set apart to her under an Act of Congress approved June 28, 1898, who died in possession thereof prior to an Act of Congress approved March 1, 1901, made, executed and delivered by heirs of said allottee before the expiration of five years from the ratification of the agreement with the Creek Nation contained in said Act of March 1, 1901, and prior to an Act of Congress approved April 26, 1906, is void.

5.   SAME. A deed to an undivided interest in the allotment of a citizen of the Creek Nation, set apart to her under an Act of Congress approved June 28, 1898, who died in possession thereof prior to an Act of Congress approved March 1, 1901, made, executed and delivered by heirs of said allottee after the expiration of five years from the ratification of the agreement with the Creek Nation contained in said Act of March 1,

1901, and after an Act of Congress approved April 26, 1906, is valid.

(Syllabus by the Court.)

*Error from the United States Court for the Western District of the Indian Territory, at Tulsa; William R. Lawrence, Judge.*

Action by Judson C. Fast against John W. Sanders and others. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

On August 26, 1907, Judson C. Fast, one of defendants in error, plaintiff below, sued John W. Sanders, plaintiff in error, one of defendants below, individually and as guardian of Elizabeth Sanders, Maud Sanders and Millard Sanders, minors, and Warren Mooney, defendants in error, defendants below, in the United States Court for the Indian Territory, Western District, at Muskogee, in ejectment, for an undivided 1/3 interest in "the east half of the northwest quarter and lots one and two in section 19, township 15 north of range 19, east," containing 159.56 acres, and stated his cause of action, in substance, to be that on April 28, 1900, one Sarah E. Sanders, a citizen of the Creek Nation of less than full blood and duly enrolled as such, died intestate in said nation leaving her surviving as her only heirs at law her adult children, Edward B. Porter and Ben E. Porter, by a former husband, and Edna Sanders, an adult child, and Elizabeth Sanders, Maude Sanders and Millard Sanders, minor children by said John W. Sanders, all of whom are citizens by blood of the Creek Nation and duly enrolled as such, except said John W. Sanders, her non-citizen husband; that after her death and after an Act of Congress approved March 1, 1901, and after the ratification on May 25, 1901, by the Creek Tribe of the agreement therein contained, the Commission to the Five Civilized Tribes, to wit, on April 21, 1905, caused patents to issue distributing and allotting said land to which said Sarah E. Sanders would have been entitled, if living, to her heirs, one of which said patents conveyed that part of said land described as the "east half of the northwest quarter and lot one of section 19, township 15, north of

range 19, east"—the other, that part of said land described as "lot 2, in said section 19, township 15, north of range 19, east," which were on April 21, 1905, duly signed by P. Porter, Principal Chief of the Creek Nation, for and on behalf of said nation, and on May 23, 1905, duly approved by the Secretary of the Interior and subsequently duly delivered to said heirs; that under and by virtue of the terms of said agreement it was provided that the lands to which such citizens would be entitled, if living, should descend to the heirs of such citizens according to the laws of descent and distribution of the Creek Nation and be allotted and distributed to them accordingly; that the laws of said nation referred to in said treaty were as follows: (Setting them out); that they were all the laws of inheritance of said nation in force at the time of descent cast, and thereunder, on descent cast by said Sarah E. Sanders, each of her said children thereby became the owner of an undivided 1/6 interest in her said allotment; that on May 29, 1906, said Ben E. Porter made, executed and delivered, and on May 31, 1906, said Edward B. Porter made, executed and delivered their respective quitclaim deeds to plaintiff conveying to him their respective interests in said land, which said deeds were duly recorded; that said Edna Sanders conveyed her interest therein to defendant Warren Mooney; that defendant John W. Sanders, for himself and as guardian for said minor children and as agent for said Mooney, has ousted plaintiff from possession thereof and refuses to recognize his interest therein—and prays judgment for an undivided 1/3 interest therein and for general relief.

On January 19, 1907, John W. Sanders filed separate answer, in effect admitting the allegations of the complaint, except that the complaint sets forth all the Creek law of descent and distribution at the time of descent cast and that the said children of Sarah E. Sanders were her sole heirs and were entitled each to a 1/6 interest in her said allotment, but alleged the fact to be that said law was as by him therein set forth; that under said law he at that time, as her non-citizen husband, was and is entitled to an heir's part or 1/7 of her said allotment for which to her a

certificate had issued, by the Commission to the Five Civilized
Tribes, on her application, made while in possession of said lands
prior to her death, dated May 24, 1901; that prior to the execu-
tion and delivery to plaintiff of the deeds from Edward B. Porter
and Ben E. Porter, set forth in the complaint, they, to wit, on
December 15, 1904, sold and by their deed conveyed to him all
their interest in said land, by virtue of which he says he is its
owner; that prior to the conveyance of the interest of said Edna
Sanders Mooney to Warren Mooney, as set forth in said complaint,
she had conveyed all her said interest to him by quitclaim deed;
that he is in possession of said land by virtue of the title thus
acquired and his right of courtesy and as guardian for the said
Elizabeth Sanders, Maud Sanders, and Millard Sanders, and asks
that plaintiff take nothing by his suit.

On January 29, 1907, to this answer there was a general de-
murrer filed which was by the court sustained and, defendant
electing to stand on his answer, judgment was rendered in favor
of plaintiff and against defendant for the land sued for, where-
upon defendant took a writ of error to the Court of Appeals for
the Indian Territory and the same is now before us for review as
successor to that court.

*DeRoos Bailey,* for plaintiff in error.

*Irwin Donovan* and *Eward C. Griesel,* for defendant in error,
Judson C. Fast.

TURNER, J. (after stating the facts as above). By
Judson C. Fast, hereinafter called plaintiff, it is urged,
in substance, that as the pleadings disclose that Sarah E.
Sanders was a duly enrolled citizen of the Creek Nation
of less than full blood; that on September 19, 1898, she, before
the Commission to the Five Civilized Tribes, filed on the land in
controversy and died in possession thereof before certificate of al-
lotment issued and before the passage of the Act of Congress ap-
proved March 1, 1901; that therefore she acquired no estate of
inheritance in said allotment, that her heirs under the patent sub-
sequently issued took the same by purchase from the Creek Nation

and not by descent from her, and that as John W. Sanders is the non-citizen husband her surviving and, as such, not entitled to "final participation" in the lands of said nation, his answer setting up a claim to 1/7 of her allotment in defense of this suit was properly sustained.

That she died seized of no estate of inheritance we think is clear.

On September 27, 1897, the Commission to the Five Civilized Tribes, pursuant to authority vested in them by certain acts of Congress, made an agreement with certain commissioners representing the Creek Nation providing for the enrollment of its citizens and the allotment to them of their lands in severalty. This agreement was afterwards submitted to and rejected by the Creek council.

Pending the ratification of this and certain agreements with other tribes, Congress on June 28, 1898, passed an act known as the Curtis Bill, designed to transfer the property rights of the Five Civilized Tribes from their control to that of the United States.

Section 11 of that act, in effect, provides for the surface allotment of the land of the Creek Nation without the consent of the tribe, and section 30, in effect, for the resubmission, with certain modifications, of said agreement of September 27, 1897, to the Creek people, and that, if ratified, its provisions, so far as they differed from said bill, should supersede it. This agreement also failed of ratification, and the United States proceeded to allot said land without the consent of the tribe under the provision of said Curtis Bill. For that purpose said commission on April 1, 1899, opened the land office at Muskogee.

At that time the fee to the lands of the Creek Nation was in the tribe, and it is apparent that Congress by that act did not intend to disturb it and therein made no provision whereby the fee might be divested out of the tribe and vested in the allottee. The main intent of it was to segregate the lands in fair and equal share, place the citizen upon his segregation and give to him the

exclusive use and occupancy of the soil until such time as title to him thereto could be perfected.

This is made evident from that part of section 11 which provides that said commission "shall proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe * * * giving to each, so far as possible, his fair and equal share thereof * * *." Said section also provided, in effect, that said land shall be non-transferable until after full title was acquired, and in the meantime should be non-taxable. That the segregation also carried the usufruct is gathered from the entire act and particularly from that part of section 16 providing that the right of the allottee to dispose of the timber from his allotment was not by said act to be impaired. By being enrolled, taking possession of and filing on the land in controversy Sarah E. Sanders acquired no vested rights in the property in question. This has been expressly so held. *Wallace et al. v. Adams et al.,* 143 Fed. 716, was error to the United States Court of Appeals for the Indian Territory. The case was presented to the United States Circuit Court of Appeals for the Eighth Circuit to test the validity of a decree of the Choctaw and Chickasaw Citizenship Court annulling the judgments of the United States courts in the Indian Territory admitting certain persons to citizenship under the Act of June 10, 1906, among whom was one Hill who had, after the Act of June 28, 1898, and the adoption of the Atoka Agreement, appeared before the Commission to the Five Civilized Tribes, filed on his allotment and taken possession thereof, but to whom no certificate of allotment issued. After said decree admitting him to citizenship had been thus annulled, said commission allotted the lands and issued certificates to plaintiff, who brought ejectment against him and those claiming under him for possession of the land. Hill relied on the judgment admitting him to citizenship and his filing on and possession of the allotted land as giving him a vested right in the land, but the court, among other things, held that by reason thereof no vested right accrued, and affirmed the judgment of the trial court against him.

We are therefore of the opinion that when Sarah E. Sanders appeared before said commission, filed on and took possession of her allotment, and died she had no vested right therein and was at that time seized of no inheritable estate in said land.

It is next contended by John W. Sanders, plaintiff in error, that said allotment went to the heirs of said Sarah by descent under the laws of descent and distribution of the Creek Nation, by virtue of which he says he is entitled to an "heir's part" or an undivided 1/7 interest therein. On the other hand, it is contended by the defendant in error, Judson C. Fast, that while said heirs are to be nominated by the laws of descent and distribution of the Creek Nation, yet said land did not descend; that they take by purchase direct from the Creek Nation; that said Sanders, not being entitled thereunder, as the noncitizen husband of said Sarah, her surviving, to participate in the "final distribution" of the lands of said tribe, took no part thereof. Thus we are asked to determine whether or not the heirs of Sarah E. Sanders, as to her said allotment, by virtue of the Creek law, are in by descent or purchase.

The records of said commission disclosed that from April 1, 1899, to June 30, 1901, 10,617 persons appeared before it and made application to secure allotments; that 9,557 of them received preliminary allotments of 160 acres and 1,060 made partial selections, and that the selections up to that time covered 1,626,917 acres. Under this condition of affairs, it being the policy of the United States to accomplish allotment with the consent of the tribe, and having so far failed to do so, in view of the vast number of allotments so made, in order, among other things, to accomplish peaceful allotment and to put the legal status of those already made beyond question and to save, perhaps, the United States the vast work and expense of making them over, said commission in March, 1900, negotiated another agreement with the representatives of the Creek Nation, which was approved by Congress March 1, 1901, ratified by the Creek Council May 25, 1901, and afterwards known as "The Original Agreement." With refer-

Vol 28—5

ence to those allotments already made, which included the one in question, said agreement provided:

"Section 6. All allotments made to Creek citizens by said commission prior to the ratification of this agreement, as to which there is no contest, and which do not include public property, and are not herein otherwise affected, are confirmed, and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement; and said commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore, conforming to provisions herein; and all controversies arising between citizens as to their rights to select certain tracts of land shall be determined by said commission."

In effect, this section provides that all allotments theretofore made, as stated, "as to which there is no contest, and which do not include public property, and are not herein otherwise affected, are confirmed"; that is, are to stand as made and need not be made over again, and, as made, are to stand on an equal footing "as to appraisement and all things else," which includes their devolution on descent cast, with those to be made under said agreement.

Said section fixed the status of this allotment and as to how it should go on descent cast, which was that it should stand on an equal footing with those to be made thereunder and, like them, was to be governed as to its devolution by the provision of that agreement. The next section provides for this and reads:

"Section 7. Lands allotted to citizens hereunder shall not in any manner whatsoever, or at any time, be encumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the date of the deed to the allottee therefor, and such lands shall not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior.

"Each citizen shall select from his allotment forty acres of land as a homestead, which shall be non-taxable and inalienable and free from any incumbrance whatever for twenty-one years, for which he shall have a separate deed, conditioned as above: Provided: That selections of homesteads for minors, prisoners, con-

victs, incompetents, and aged and infirm persons, who cannot se-
lect for themselves, may be made in the manner herein provided
for the selection of their allotments; and if, for any reason, such
selection be not made for any citizen, it shall be the duty of said
commission to make selection for him.

"The homestead of each citizen shall remain, after the death
of the allottee, for the use and support of children born to him
after the ratification of this agreement, but if he have no such
issue, then he may dispose of his homestead by will, free from lim-
itation herein imposed, and if this be not done, the land shall
descend to his heirs according to the laws of descent and distribu-
tion of the Creek Nation, free from such limitation."

These sections would seem in plain terms to place it beyond a
peradventure, and it was the intent of this agreement that all al-
lotments that had been made or would be made thereunder before
descent cast should, on that event, descend to the heirs of the
person casting the descent, "according to the laws of descent
and distribution of the Creek Nation"; that is, that it should be
distributed to such heirs as might be provided by said law. It
might be interesting to determine whether the word "descend,"
as here used, was intended to be construed in its strict sense or
should be understood as having been used in its common accep-
tation; but the inquiry would serve no good purpose, as we are
of the opinion that the same persons were intended to take in
either event. Then who were the heirs of Sarah E. Sanders at
that time according to said law? Both sides agree that said law
is and was as follows:

"Section 6. Be it further enacted that if any person die with-
out a will, having property and children, the property shall be
equally divided among the children by disinterested persons, and
in all cases where there are no children the nearest relation shall
inherit the property." (Laws of Muskogee Nation, 1880, p. 132.)

"Section 8. The lawful or acknowledged wife of a deceased
husband shall be entitled to one-half of the estate if there are no
other heirs, and an heir's part if there should be other heirs, in all
cases where there is no will. The husband surviving shall inher-
it of a deceased wife in like manner." (*Idem,* p. 69.)

"Section 1. All non-citizens not previously adopted and

being married to citizens of this nation, or having children entitled to citizenship, shall have a right to live in this nation and enjoy all the privileges enjoyed by other citizens, except participation in the annuities and in the final participation in the lands." (*Idem,* p. 60.)

—Which we construed in *De Graffenreid v. Iowa Land and Trust Company,* 20 Okla. 687, 93 Pac. 624, to read as follows:

"Section 6. Be it further enacted that if any person die without a will, having property and children, the property shall descend to the child or children and their descendants, if any, equally, and if no child or descendants, and the estate descended to the intestate on the part of the father, then to the father, and if no father living, then to the brothers and sisters of the blood of the father, etc. If the estate descended to the intestate on the part of the mother, then to the mother, and if no mother living, then to the brothers and sisters of the blood of the mother; Provided:

"Section 8. The lawful or acknowledged wife of a deceased husband shall be entitled to one-half of the estate, if there are no children or their descendant, and a child's part, if any such there be, in all cases where there is no will. The husband surviving shall inherit of the wife in like manner."

Under section 6, *supra,* it is clear that Edward B. Porter, Ben E. Porter, Edna Sanders, Elizabeth Sanders, Maud Sanders and Millard Sanders, being her children her surviving, are each an heir and as such entitled to an undivided 1/6 interest in the allotment of Sarah E. Sanders, unless John W. Sanders, the noncitizen husband her surviving, is also an heir and as such entitled to a share therein under sections 8, and 1, *supra.* In said case, discussing who were heirs in strict sense under said section, we said:

"But, suppose they were used in their technical sense, who are heirs? Bouvier's Law Dictionary says an 'heir' is: 'He who is born or begotten in lawful wedlock and upon whom the law casts the estate in lands, tenements or hereditaments immediately upon the death of his ancestor.' What law? The law of the country where the land is situated. In this case, the Creek law.

" 'An heir is whoever by the laws of the country hath right to inherit or succeed to the estate immediately upon the death of an owner, and is different as the law varies in different countries.' (*Larrabee v. Larrabee,* 1 Root [Conn.] 555.)

"What right have we to believe that there are heirs under the Creek law other than is named in sections 6 and 8 under construction, and which is agreed to be the law of descent and distribution of the Creek Nation in force at the time of descent cast in this case? None whatever. Then who are denominated heirs under that law? The children, the 'nearest relation' (in this case, the mother), and the husband or wife of the deceased."

It is unnecessary to enter into an elaborate discussion of these statutes. We think it sufficient to say that such was done by this court in said cause. It was there held that under sections 8 and 1, *supra,* as construed by us, aided by the construction placed thereon by the supreme court of the Creek Nation prior to the making of said original agreement, a non-citizen husband of a citizen wife, her surviving, was an heir to her and as such took an "heir's part" in her lands.

In that case it was further held that the term "heir" as used in section 8, *supra,* meant "child," and accordingly we are constrained to hold that by an "heir's part," mentioned therein, is intended to mean a "child's part"; that John W. Sanders is entitled to a "child's part" of the lands in controversy and should share and share alike therein with the children of Sarah E. Sanders, and that said John W. Sanders, Ben E. Porter, Edward B. Porter, Edna Sanders (*nee* Mooney), Elizabeth Sanders, Maud Sanders and Millard Sanders, or their grantees, are each entitled to an undivided 1/7 interest in her said allotment.

It will not do to say in any case of either descent or purchase that the "heirs" stop at the children or their descendants, as is contended by Judson C. Fast, to the exclusion among others of the non-citizen husband, the brothers and sisters and the nearest relation, for the reason. that such a construction would soon bring about an escheat. We think it more proper to hold that when any of such take, they take as heirs, and that when we say the non-citizen husband is entitled to an "heir's part," we mean that he is entitled to such as an "heir" of the deceased.

We are not unmindful of the contention of defendant in error, Judson C. Fast, that in case said heirs took by purchase, it was

not the intent to include the non-citizen husband within the term "heir," for the reason that to permit him to take would be to admit him to "a final participation in the lands of the Creek Nation," contrary to section 1, *supra*. But with this contention we cannot agree, as we are of the opinion that such would not be a "final participation" within the meaning of said section.

By excluding him from "final participation" in the lands of the tribe it was never intended to exclude him from taking a child's part in the allotment of his deceased wife, but it was intended to and did exclude him from the right to receive an allotment for himself and in his own right, or, as stated by us in *De Graffenreid v. Iowa Land and Trust Company, supra*, in construing said section:

"This act was intended to and did extend to the intermarried non-citizen the right to inherit under tribal law and put him on the same footing under that law with all other citizens, except, as so aptly expressed by the learned Judge of the United States Court for the Western District of the Indian Territory in the case of Edward Porter *et al.* v. Eck E. Brook, 'that he shall not be counted in making the great fraction which shall express what share of the soil shall belong to each citizen; that is, he shall not receive an allotment.'"

As a further defense to this action, defendant in his answer sets up title in himself to the alleged interest of plaintiff in the lands in controversy, evidenced by quitclaim deed duly recorded from Ben E. and Edward B. Porter, plaintiff's grantors, dated December 15, 1904, and contends that the court erred in sustaining a demurrer thereto, thereby in effect holding that said deed conveyed to him no title. As the deeds relied on by plaintiff for a recovery herein are from the same parties, and purport to convey the same interest in the lands in controversy, but are of a date subsequent to defendant's deed, to wit, May 29 and 31, 1906, we will determine whether the court erred in holding, in effect, as stated, and that the title to the interests of plaintiff's grantors passed under their deed to plaintiff subsequently executed.

Defendant, in support of his alleged title thus acquired, con-

cedes that his grantors, not being freedmen, had no right to convey any portion of the land described in his deed, unless at that time the restrictions upon the alienation thereof had been removed, which he says was done, at least as to the homestead, by section 7, *supra.* With this contention we cannot agree, but are of the opinion that the only limitation removed by said section on the allotment by the death of the allottee is the limitation that the homestead "shall be non-taxable and inalienable and free from incumbrance for 21 years," and that the original five-year limitation against alienation remained on the entire allotment, no part of which could be alienated within that time except with the approval of the Secretary of the Interior. This was, in effect, so held in *De Graffenreid v. Iowa Land & Trust Company,* 20 Okla. 687. At the time that opinion was rendered this had, unknown to this court, been expressly so held by the Assistant Attorney General for the Interior Department in an opinion rendered and approved by the Secretary of the Interior August 10, 1906, in which he, among other things, said:

"This section (sec. 7 of the Original Agreement), in its first paragraph, makes a clear, emphatic and unequivocal inhibition against the alienation of any part of the allotted lands within five years or until May 25, 1906, except by approval of the Secretary of the Interior. The words are general and include the homestead as well as other lands.

"The second paragraph makes a further and longer term of inalienability of twenty-one years for the homestead lands, without power to the Secretary of the Interior to shorten it.

"The third paragraph, continuing to deal with the homestead, limits its descent to particular heirs, issue born after May 25, 1901, excluding other issue and excluding any power of the allottee by will to defeat the descent to the particular heirs. It then provides that if there are no particular heirs, he may dispose of the homestead by will 'free from limitation herein imposed', and that if he makes no will, the homestead shall descend to his heirs 'free from such limitation.'

"There are two distinct limitations against alienation, one for five years applying to all allotted lands, and a second for twenty-one years, applying to homestead lands. The latter does not in

terms nor by any necessary implication exclude operation of the former. It is an added and further one for non-alienation of the homestead. Through the second and third paragraphs of the sections there is a continuity of subject of thought, viz., the homestead, and all provisions of both paragraphs have reference thereto.

"Nothing in the act indicates an intent of Congress to make title of inherited homestead lands freer of alienation by heirs of a decedent than the lands not of a homestead character. On the contrary, the only distinction made by Congress between the homestead and the other land was to make them less alienable.

"I am therefore of the opinion, that the words 'limitation herein imposed' and 'such limitation' have reference to the twenty-one year limitation against alienation of homestead lands and have no reference to the five-year general limitation against alienation of any allotted lands."

This was a practical construction of this section by public officers of the government, including the Attorney General, whose duty it was to give an opinion. It is therefore deserving of·consideration (*Edwards v. Darby,* 12 Wheaton [U. S.] 210; *Union Ins. Co. v. Hogue,* 21 How. [U. S.]66), and tends to strengthen our minds as to the correctness of our former ruling.

We are therefore of the opinion that defendant took nothing by his deed from Ben. E. Porter and Edward B. Porter dated December 15, 1904; that plaintiff acquired their said interest in the allotment in controversy by their deeds dated May 29 and 31, 1906, the same having been made subsequent to the Act of Congress approved April 26, 1906, which reads:

"Section 22. That the adult heirs' of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper·United States Court for the Indian Territory. * * *"

—and that the court did not err in sustaining the demurrer to the answer of defendant setting forth this defense.

Defendant further contends that plaintiff should take nothing by this suit because, he says, that he is entitled to the possession of the allotment in controversy as tenant by courtesy. This position is untenable for the reason, as we have said, that Sarah E. Sanders died seized of no estate of inheritance in said lands.

It is unnecessary to discuss other questions raised in the brief. It follows that the lower court erred only in sustaining the demurrer to the first defense, and for that reason this cause is reversed and remanded to be proceeded with in accordance with this opinion.

All the Justices concur.