### FRAME et al. v. BIVENS et al.

(Circuit Court, E. D. Oklahoma. October 30, 1909.)

No. 237.

1. INDIANS (§ 15*)—LANDS—ALIENATION—SURPLUS LANDS.

Under the provision of the Indian appropriation act (Act April 21, 1904, c. 1402, § 1, 33 Stat. 204), that "all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed," an adult intermarried citizen of the Chickasaw Nation, not of Indian blood, had power to execute a valid mortgage on his surplus allotment, although patent had not issued therefor, which was made a condition precedent to alienation by the supplemental agreement of July 1, 1902, with the Choctaw and Chickasaw Tribes.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

2. INDIANS (§ 15*)—LANDS—"ALIENATION"—MORTGAGE.

A mortgage given to secure a loan by an intermarried citizen of one of the Five Civilized Tribes, not of Indian blood, on his surplus lands, is a conveyance amounting to an "alienation" within the meaning of Act April 21, 1904, c. 1402, § 1, 33 Stat. 204, removing all restrictions on alienation by such allottees except as to homesteads.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 1, pp. 302-306; vol. 8, p. 7571.]

---

3. Words and Phrases—"Conveyance."
    A conveyance is the transfer of the title of land from one person or
    class of persons to another.
        [Ed. Note.—For other definitions, see Words and Phrases, vol. 2, pp.
    1575-1584; vol. 8, p. 7619.]

Appeal from the United States Court for the Southern District of
Indian Territory.

Suit by J. A. Bivens and W. A. Wolverton against W. B. Frame
and J. S. B. Apollos. Decree for complainants, and defendants appeal. Affirmed.

L. S. Dolman, for appellants.
Potterf & Walker, for appellees.

CAMPBELL, District Judge. This case was tried in the United
States Court for the Southern District of Indian Territory, and a
decree rendered in favor of appellees on June 7, 1907. Thereafter
appellants appealed the case to the Court of Appeals for the Indian
Territory, and the case was pending in that court undetermined when
statehood intervened.

Pursuant to provisions of the enabling act (Act June 16, 1906, c.
3335, 34 Stat. 267), it is now before this court for determination. The
history of the case is substantially as follows:

On December 13, 1906, appellees, plaintiffs below, filed their complaint in equity, and alleged, in substance: That on or about May
28, 1905, Walcott & Mulkey borrowed from one Mrs. Maud Phillips $2,000, and executed therefor their certain promissory note. That
plaintiffs signed said note as sureties for the said Walcott & Mulkey. That theretofore, to wit, August 1, 1905, the defendants Arthur
Walcott and Lutie May Walcott, his wife, and John G. Mulkey and
Elsie Mulkey, his wife, joined in a mortgage upon the lands described in said complaint, the same being the lands or a portion of the
lands, allotted to the said John G. Mulkey and Arthur Walcott as
intermarried citizens of the Chickasaw Nation of Indians, exclusive
of the homestead of each and commonly called their "surplus allotments." That thereafter, on November 28, 1905, the parties joined in
a renewal of said note for a period of six months. That said mortgage was duly recorded in the office of the clerk of the United States
Court at Ardmore, Ind. T., October 31, 1905, in book 28, at page
80. That by the terms of said mortgage defendants conveyed to
plaintiffs said lands. That said note became due and was not paid,
and J. A. Bivens, one of said sureties, on November 28, 1906, assumed and paid the same. That defendants W. B. Frame and Beula
Frame, and J. S. B. Apollos and Lizzie Apollos, are claiming the surplus lands of Mulkey under a conveyance in the nature of a quitclaim
deed from Mulkey made subsequent to said mortgage, and are in
possession of said lands through tenants. That the said Arthur
Walcott and John G. Mulkey are citizens by intermarriage, and not
by blood, of the Chickasaw Nation and of the United States, and
that they are insolvent. They pray a foreclosure of their mortgage

and a sale of the lands and a receiver during the pendency of the suit. On January 2, 1907, appellees W. B. Frame and J. S. B. Apollos filed a motion to make more specific and certain and a general and special demurrer, both of which were overruled by the court and excepted to by defendants. April 6, 1907, defendants Frame and Apollos filed an answer in which they admit the allegations in plaintiffs' complaint, except that they deny that the mortgage conveyed or affected the land allotted to John G. Mulkey in any way, and deny that the record of it constituted any notice to them. Defendants further admit that subsequent to the date of the mortgage, to wit, on May 11, 1906, they acquired by purchase and took possession of said lands and are still in possession of the same. Defendants allege that these lands are a portion of the lands selected by John G. Mulkey as such Indian under the act of July 1, 1902 (supplemental agreement), exclusive of his homestead. That his allotment certificate is dated October 21, 1903, and that his patent thereto had not issued at the time of the filing of the suit. That the mortgage sued on was contrary to sections 15 and 16 of said supplemental agreement. Defendants ask that the complaint be dismissed and for costs. Plaintiffs filed June 7, 1907, a general demurrer to defendants' answer which was upon the same day sustained by the court, which ruling was excepted to by defendants, whereupon defendants announced their intention not to plead further in the cause, and judgment was rendered against all the defendants as prayed for, including these defendants, and a decree entered upon said judgment, decreeing that the lands belonging to these defendants should be sold first, and, if they failed to bring the amount of the judgment, then resort should be had to the other lands therein, all of which was duly excepted to by defendants.

[1] There are numerous errors assigned by the appellants, but they may all be condensed in the one paragraph found on page 6 of appellants' brief, which is as follows:

"Briefly stated, the error complained of consists in holding that a mortgage of the surplus lands of an intermarried citizen of the Chickasaw Nation of Indians, given subsequent to allotment and the act of April 21, 1904, and prior to the issuance of patent and the act of April 26, 1906, was valid and enforceable against lands in possession of a grantee of the intermarried citizen, who purchased subsequent to the act of April 26, 1906."

In Act June 28, 1898, c. 517, 30 Stat. 495, relating to allotment of lands, it was provided that the lands allotted should be nontransferable until after full title should be acquired, and should be liable for no obligation contracted prior thereto by the allottee. It was further provided that if the agreement relating to the Choctaws and Chickasaws, commonly known as the "Atoka Agreement," which was incorporated in the act, should be ratified, the provisions of the act should only apply where the same would not·conflict with the terms of said agreement. This agreement was ratified. In this agreement it was provided that the surplus land allotted to adult members should be alienable for a price to be actually paid and to include no former indebtedness or obligation—one-fourth in ·one year, one-fourth in

three years, and the balance in five years from date of patent. This agreement was followed by Act July 1, 1902, c. 1362, 32 Stat. 641, relating to the Choctaws and Chickasaws, commonly known as the "Supplemental Agreement," which provided in detail for the allotment of land..

Section 3 of the supplemental agreement provides as follows:

"The words 'member' or 'members' and 'citizen' or 'citizens' shall be held to mean members or citizens of the Choctaw or Chickasaw Tribe of Indians in Indian Territory, not including freedmen."

Section 15 provides:

"That lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt or obligation of any character, contracted prior to the time at which said lands may be alienated under this act, nor shall said lands be sold, except as herein provided."

Section 16 provides:

"All lands allotted to the members of said Tribes, except such land as is set aside to each for a homestead, as herein provided, shall be alienable after issuance of patent, as follows: one-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years, in each case from date of patent."

Section 23 provides:

"Allotment certificates issued by the commission to the Five Civilized Tribes shall be conclusive evidence of the right of any allottee to the tract of land described therein."

Section 71 provides:

"After the expiration of nine months after the date of the original selection of an allotment by or for any citizen or freedman of the Choctaw and Chickasaw Tribes, as provided in this agreement, no contest shall be instituted against such selection."

By the Indian appropriation act (Act April 21, 1904, c. 1402, 33 Stat. 204), it was provided that:

"All the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed."

By Act Cong. April 26, 1906, c.1876, 34 Stat. 137, entitled "An act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes," it was provided:

"That conveyances heretofore made by the members of any of the Five Civilized Tribes, subsequent to the selection of allotment and subsequent to the removal of restrictions, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances are made prior to the issuance and recording or delivery of patent or deed." Section 19.

At the time the mortgage was made from Mulkey to appellees, Mulkey held the land in controversy by virtue of his allotment certificate. As said by Judge Sanborn in Wallace v. Adams, 143 Fed. 716, 74 C. C. A. 540:

"The allotment certificate, when issued, like a patent to land, is dual in its effect. It is an adjudication of the special tribunal empowered to decide the

question that the party to whom it issues is entitled to the land and is a conveyance of the right to this title to the allottee."

The interest in the land conveyed to Mulkey by the allotment certificate was such a property interest as he could have immediately conveyed to another but for the restrictions imposed upon its alienation by the terms of the agreement. Doe et al. v. Wilson, 23 How. 457, 16 L. Ed. 584; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49.

Now, what were the restrictions upon the alienation of the land in controversy? They were finally fixed by section 16 of the supplemental agreement of 1902, quoted above, namely, that it should be alienable after issuance of patent, one-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years in each case from date of patent. The first prerequisite to alienability was the issuance of a patent. The second, the expiration of a prescribed time after the date of that patent. These prerequisites to alienability constitute the restrictions upon alienation. But Mulkey was an adult allottee, not of Indian blood, and the land was not his homestead. As to such allottees, the act of April 21, 1904, above quoted, removed all restrictions upon the alienation of their surplus lands.

We have seen that on April 21, 1904, Mulkey had a property interest in the land which but for the restrictions imposed he could have alienated or conveyed. The act removes "all" restrictions, as well that relating to the issuance of patent as that prescribing and fixing the time which must elapse after date of patent. Therefore the contention of appellants that the act of April 21, 1904, did not remove the necessity that patent should issue as a prerequisite to alienation must fail. After the passage of that act, Mulkey could convey or alienate his interest in the land in controversy without restriction. There having subsequently arisen some question as to whether, notwithstanding the act of April 21, 1904, the lands thereby intended to be relieved from restrictions could be sold by allottees before issuance of patent, Congress by the provision above quoted from the act of April 26, 1906, settled the question by declaring that the prior issuance of patent was not necessary to the conveyance by the allottee of such right or interest in the land as he held by virtue of the certificate. By this provision, in my judgment, Congress was merely declaring and making clearer, if possible, what was intended by the act of April 21, 1904. It was not an attempt to validate transactions theretofore deemed invalid. Nor can appellants complain that their interests are in any way affected by this act, for the conveyance under which they claim is of a still later date.

Does the right to alienate include the right to mortgage? To "alienate" is to "convey"; to "transfer." 1 Bouvier's Law Dictionary, p. 130.

[3] A conveyance is the transfer of the title of land from one person or class of persons to another. 1 Bouvier's Law Dictionary, p. 434. As is customary in such instruments, the mortgage in this case

provides that the morgtagors granted, bargained, sold, and conveyed to the mortgagees the lands involved, conditioned that upon payment of the note and interest the instrument shall be void, otherwise to remain in full force and effect. At the time this mortgage was made certain statutes of Arkansas relating to mortgages were in force in Indian Territory by virtue of an act of Congress. At the time these statutes were so adopted, the effect given to mortgages by the Supreme Court of that state is thus stated in the syllabus to Whittington v. Flint, 43 Ark. 504, 51 Am. Rep. 572:

"The legal estate in mortgaged property passes to the mortgagee, subject to be defeated by performance of the conditions of the mortgage; and the right of possession follows the legal title, unless controlled by stipulations in the deed, or by the apparent intention of the parties."

In the case last mentioned the court refers to the decision of the United States Supreme Court in Conard v. Atlantic Insurance Company, 1 Pet. 386, 7 L. Ed. 189. In that opinion the Supreme Court had occasion to consider the effect of a mortgage, and said:

"Then, again, it is contended on behalf of the United States that the priority thus created by law, if it be not of itself a lien, is yet superior to any lien, and even to an actual mortgage, on the personal property of the debtor. It is admitted that, where any absolute conveyance is made, the property passes, so as to defeat the priority; but it is said that a lien has been decided to have no such effect, and that in the eye of a court of equity a mortgage is but a lien for a debt. Thelusson v. Smith, 2 Wheat. 396, 4 L. Ed. 271, has been mainly relied on in support of this doctrine. That case has been greatly misunderstood at the bar, and will require a particular explanation. But the language of the learned judge who delivered the opinion of the court in that case is conclusive on the point of a mortgage. 'The United States,' said he, 'are to be first satisfied; but then it must be out of the debtor's estate. If, therefore, before the right of preference has accrued to the United States, the debtor has made a bona fide conveyance of his estate to a third person, or has mortgaged the same to secure a debt, or if his property has been seized under a fieri facias, the property is divested out of the debtor, and cannot be made liable to the United States.' The same doctrine may be deduced from the case of United States v. Fisher, 2 Cranch, 358, 2 L. Ed. 304, where the court declared that 'no bona fide transfer of property, in the ordinary course of business, is overreached by the statutes,' and 'that a mortgage is a conveyance of property, and passes it conditionally to the mortgagee.' If so plain a proposition required any authority to support it, it is clearly maintained in United States v. Hooe, 3 Cranch, 73 [2 L. Ed. 370]. * * *

"It is true, that in the discussions in courts of equity a mortgage is sometimes called a lien for a debt. And so it certainly is, and something more. It is a transfer of the property itself, as security for the debt. This must be admitted to be true at law, and it is equally true in equity; for in this respect equity follows the law. It does not consider the estate of the mortgagee as defeated and reduced to a mere lien, but it treats it as a trust estate, and, according to the intention of the parties, as a qualified estate, and security. When the debt is discharged, there is a resulting trust for a mortgagor. It is therefore only in a loose and general sense that it is sometimes called a lien, and then only by way of contrast to an estate absolute and indefeasible."

[2] In my judgment the mortgage in this case was a conveyance amounting to alienation as that term is used in the act of April 21, 1904. In view of the class of persons, the character of the land affected by the act, and the local conditions and circumstances which evidently occasioned this legislation, I cannot conceive that Congress

intended that while an individual of the class named might convey his land by deed absolute and indefeasible, without regard to the adequacy of the consideration, he might not convey it conditionally as provided by this mortgage.

The decree of the United States Court for the Southern District of Indian Territory is therefore affirmed.