RENTIE *et al.* v. McCOY *et al.*

No. 2961.   Opinion Filed November 26, 1912.

(128 Pac. 244.)

1.   **INDIANS—Lands—Alienation.**  Scott Rentie, a minor, and a duly enrolled Creek freedman, died July 2, 1899, without a surviving widow or children; his allotment not then having been selected. On August 15, 1902, his distributive share of land, as a member of said tribe, was allotted to his heirs.

On April 8, 1905, Morris and Katie Rentie, who were the father and mother of Scott Rentie, and his surviving heirs, executed in due form a warranty deed covering said allotment to D. On May 25, 1905, D. conveyed by warranty deed to E. M., who then and there took possession of said premises and remained in possession until he conveyed to H. M., to whom he surrendered possession. H. M. continued in possession until 1909, when an ejectment action was brought for possession.  **Held:**

(a)   That said land passed to Morris and Katie Rentie free from restrictions.

(b)   That said land was alienable on April 8, 1905, when Morris and Katie Rentie conveyed to D.

2.   **TRIAL—Demurrer to Evidence—Uncontroverted Evidence.**  The facts in the record without contradiction showing a delivery of a deed executed on April 8, 1905, no error was committed in sustaining a demurrer to the evidence of plaintiffs (plaintiffs in error).

(Syllabus by the Court.)

*Error from District Court, Tulsa County;*
*L. M. Poe, Judge.*

Action by Morris Rentie and others against Harriet P. Mc-
Coy and others. Judgment for defendants, and plaintiffs bring
error. Affirmed.

*J. J. Henderson,* for plaintiffs in error.

*Roach & Bradley,* for defendants in error.

WILLIAMS, J. The plaintiffs in error, to wit, Morris
Rentie, Katie Rentie, and Solomon Blevins, as plaintiffs, brought
an action in ejectment in the lower court against the defendants in
error, Harriet P. McCoy, Edward McCoy, and J. C. Cloud, as de-
fendants, for the possession of 160 acres of land situated in Tulsa
county. This proceeding in error is to review the judgment
therein.

The parties will be referred to in the order in which they
appeared in the trial court.

The land sued for on August 15, 1902, was allotted to the
heirs of Scott Rentie, who was a Creek freedman, and who died
on July 2, 1899, not having selected his allotment; the said Scott
Rentie being a minor.

Under act of Congress of March 1, 1901, entitled "An act
to ratify and confirm an agreement with the Muskogee or Creek
tribe of Indians, and for other purposes" (chapter 676, 31 St.
at L. 869), section 28 provides:

"All citizens who were living on the first day of April,
eighteen hundred and ninety-nine, entitled to be enrolled under
section twenty-one of the act of Congress approved June twenty-
eight, eighteen hundred and ninety-eight, entitled 'An act for
the protection of the people of the Indian Territory, and for other
purposes,' shall be placed upon the rolls to be made by said com-
mission under said act of Congress, and if any such citizen has
died since that time, or may hereafter die, before receiving his
allotment of lands and distributive share of all the funds of the
tribe, the lands and money to which he would be entitled, if living,
shall descend to his heirs according to the laws of descent and
distribution of the Creek Nation. * * *"

The act of June 30, 1902, entitled "An act to ratify and confirm a Supplemental Agreement with the Creek tribe of Indians, and for other purposes" (chapter 1323, 32 St. at L. 500), section 6, provides:

"The provisions of the act of Congress approved March 1, 1901 (31 St. at L. 861) in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas, now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

Morris Rentie and Katie Rentie were the father and mother of said Scott Rentie.

In *Shulthis v. McDougal et al.,* 95 C. C. A. 615, 170 Fed. 529, section 7 of the act of June 30, 1902, which provides that the lands and moneys to which such members of the Creek tribe of Indians were entitled should descend to their heirs in accordance with the provisions of said section 6, was construed, and the word "descend" there held to indicate the character of the title or estate which passed to the heirs, it not being intended that they should take the property as an additional bounty from the tribe, but by virtue of their heirship, said title being one of inheritance rather than of purchase, the situation being made the same by such provision as though the title had become vested in the decedent before his death; and that the land, to which the decedent was entitled, and which was the common property of the tribe, did not, strictly speaking, come to him by grant, inheritance, or purchase, but by a division of lands held in effect by a tenancy in common, to an interest in which he was born as a member of the tribe entitled to enrollment therein; but that, applying the statute by analogy, such land was not a "new acquisition;" but came to him by the blood of his tribal parent; and that therefore on his death and the subsequent allotment, such tribal parent took the full title and not merely a life estate.

In *Shulthis v. McDougal et al.*, 225 U. S. 561, 32 Sup. Ct. 704, 56 L. Ed. 1205, decided by the Supreme Court of the United States on June 7, 1912, it was held that said case was one in which the jurisdiction of the Circuit Court depended entirely upon the theory of diverse citizenship, and therefore the judgment of the Circuit Court of Appeals was final.

But it is not essential, in order to dispose of this case, to determine whether Morris and Katie Rentie took under the act of March 1, 1901, or June 30, 1902, as the father and mother. Morris Rentie and Katie Rentie were both enrolled as Creek freedmen, and executed the deed to Davis.

Only two questions are essential to be determined under this record:

Was said 160 acres of land, which comprehended the entire allotment of a member of the Creek tribe of Indians, free from restrictions at the time the same was conveyed by said Renties to Davis on April 8, 1905?

1. Section 16 of the Creek Supplemental Agreement (32 St. at L. 503) provides:

"Lands allotted to citizens (of the Creek Nation) shall not in any manner whatever, or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this Supplemental Agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear. * * * The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed."

Section 22 of the Choctaw and Chickasaw Supplemental Agreement (32 St. at L. p. 643, c. 1362) provides:

"If any person whose name appears upon the rolls prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor. If, however, such administrator or executor be not duly and expeditiously appointed, or fails to act promptly when appointed, or for any other cause such selection be not so made within a reasonable and practicable time, the Commission to the Five Civilized Tribes shall designate the lands thus to be allotted."

In *Mullen et al. v. United States,* 224 U. S. 455, 32 Sup. Ct. 498, 56 L. Ed. 834, it is said:

"In cases falling within this paragraph (said section 22), there is no requirement for the selection of any portion of the allotted lands as a homestead, and there is no ground for supposing that it was the intention of Congress that a provision for such selection should be read into the paragraph, so as to assimilate it to paragraph 12, relating to allotments to living members. While the lands were to be allotted in the name of the deceased allottee, they passed at once to his heirs, and as each heir, if a member of the tribe, was already supplied with his homestead of 160 acres, there was no occasion for a further selection for that purpose from the inherited lands. No distinction is made between the heirs; they might or might not be members of the tribe; and, where there were a number of heirs, each would take his undivided share. It is quite evident that there is no basis for implying the requirement that in such case there should be a selection of a portion of the allotment as a homestead, and all the lands allotted under paragraph 22 are plainly upon the same footing. While it appears from the record that, in the present case, separate certificates of allotment were issued for homestead and surplus lands, this was without the sanction of the statute.

"In the agreement with the Creek Indians (Act of March 1, 1901, 31 St. at L. 861, 870, c. 676), it was provided that in the case of the death of a citizen of the tribe after his name had been placed upon the tribal roll made by the commission, and before receiving his allotment, the lands and moneys to which he would have been entitled, if living, should descend to his heirs, 'and be

allotted and distributed to them accordingly.' The question arose whether, in such cases, there should be a designation of a portion of the allotment as a homestead. In an opinion under date of March 16, 1903, the then Assistant Attorney General for the Interior Department (Mr. Van Devanter) advised the Secretary of the Interior that this was not required by the statute. He said: 'After a careful consideration of the provisions of law pertinent to the question presented, and of the views of the Commissioner of Indian Affairs and the Commission to the Five Civilized Tribes, I agree with the latter that, in all cases where allotment is made directly to an enrolled citizen, it is necessary that a homestead be selected therefrom and conveyed to him by separate deed; but that, where the allotment is made directly to the heirs of a deceased citizen, there is no reason or necessity for designating a homestead out of such lands, or of giving the heirs a separate deed for any portion of the allotment, and therefore advise the adoption of that rule.' It is true that under the Creek Agreement, in cases where the ancestor died before allotment, the lands were to be allotted directly to the heirs, while under the Choctaw and Chickasaw Agreement the allotment was to be made in the name of the deceased member, and 'descend to his heirs.' This, however, is a merely formal distinction and implies no difference in substance. In both cases the lands were to go immediately to the heirs, and the mere circumstance that, under the language of the statute, the allotment was to be made in the name of the deceased ancestor, instead of the names of the heirs, furnishes no reason for implying a requirement that there should be a designation of a portion of the lands as homestead.

"We have, then, a case where all the allotted lands going to the heirs are of the same character, and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for allotments to living members, where there is a segregation of homestead and surplus lands respectively. Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for importing it into paragraph 22, where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases, so as to make it applicable to all the lands taken by the heirs,

and there is no occasion or authority for creating a division of the lands so as to impose a restriction upon a part of them.

"There being no restriction upon the right of alienation, the heirs in the cases involved in this appeal were entitled to make the conveyances. The bill alleged that the tracts embraced in these conveyances were 'allotted lands,' and certificates of allotment had been issued. These Indian heirs were vested with an interest in the property which, in the absence of any provision to the contrary, was the subject of sale. The fact that they were 'full-blood' Indians makes no difference in this case, for, at the time of the conveyances in question, heirs of the full-blood, taking under the provisions of paragraph 22 of the supplemental agreement, had the same right of alienation as other heirs."

The same conclusion had, prior to that decision by the Supreme Court of the United States, been reached by this court in *Hancock et al. v. Mutual Trust Co. et al.,* 24 Okla. 391, 103 Pac. 566. See, also, *United States v. Jacobs* (C. C. A.) 195 Fed. 707.

This land having been allotted to the heirs by virtue of section 28, *supra,* under *Mullen et al. v. United States, supra,* there being no distinction between section 22 of the Choctaw and Chickasaw Supplemental Agreement and section 28 of the Creek Agreement, it being held that section 16 was no part of the scheme for allotment to living members of the Choctaw and Chickasaw tribes, section 16 of said Creek Agreement is a part of the scheme of allotment for living members, and not where they died prior to allotment. That being true, the allotment having been made to the heirs under said section 28, whether mixed or full-bloods, they took it free from restrictions and the same was alienable. See, also, *Reed v. Welty* (D. C.) 197 Fed. 419, which holds to the same effect.

The act of Congress of April 21, 1904 (chapter 1402, 33 St. at L. 204), provides:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who were not of Indian blood, except minors, and except as to homesteads, are hereby removed, and all the restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads may, with the approval of the Secretary

of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe. * * * "

This provision was construed in *Godfrey v. Iowa Land & Trust Co.*, 21 Okla. 293, 95 Pac. 792, and in *Goat et al. v. United States*, 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841, decided by the United States Supreme Court on April 29, 1912. Under said provision of the act of April 21, 1904, *supra*, the restrictions upon the alienation of lands of all allottees of the Creek tribe of Indians who were not of Indian blood, except minors, and except as to homesteads, were removed.

In the case at bar the land was allotted to the heirs of Scott Rentie, pursuant to the provisions of section 28 of the Creek Agreement of March 1, 1901, *supra*, wherein it was provided that certain lands should be allotted to the heirs and distributed to them according to the laws of descent and distribution of the Creek Nation. Where members of the Creek tribe were living, the land was allotted to such member of the tribe; but where dead before allotment, and the land was allotted under said section 28, *supra*, the allotment was made to the heirs; and, although the heir may not have been a member of the Creek tribe (section 6, c. 1323, 32 St. at L. 501), and may not have, by virtue of any membership in such tribe, participated in receiving a distributive share by virtue of such membership, under the terms of this legislation he had land allotted to him if he was an heir of said deceased Indian. If so, was such heir an allottee within the terms of the act of April 21, 1904, *supra*? The heirs of Scott Rentie being freedmen and adults and not of Indian blood, as to such land except homesteads as was allotted to them as his heirs the restriction thereon was removed by said provision of the act of April 21, 1904.

In *Frame et al. v. Bivens et al.* (C. C.) 189 Fed. 785, Judge Campbell, in construing that portion of the act of April 21, 1904 (33 St. at L. p. 204, c. 1402, sec. 1), said:

"In view of the class of persons, the character of the land affected by the act, and the local conditions and circumstances which evidently occasioned this legislation, I cannot conceive that Congress intended that while an individual of the class named might convey his land by deed absolute and indefeasible, without

regard to the adequacy of the consideration, he might not convey it conditionally as provided by this mortgage."

Assuming for the purpose of this case that the restrictions imposed by section 16 of the Creek Agreement of March 1, 1901, applied to the land allotted to the heirs of Scott Rentie, it would be inconceivable that Congress intended to remove restrictions upon the lands of the members of the tribe who had had allotted to them, as a part of their distributive share of the public domain of the Creek Nation, certain lands as their allotments, where they were adults and not of Indian blood, and the same was not their homestead, and at the same time it did not intend to remove such restrictions as existed on heirs who had had allotted to them certain lands as the heirs of a member of said tribe; such heirs being adults and not of Indian blood, and the land not being a part of the homestead.

Did any restriction remain on the other 40 acres, to wit, the homestead, after the death of Scott Rentie?

Section 8 of chapter 1323 (Act of June 30, 1902, 32 St. at L. 501) provided:

"All children who have not heretofore been listed for enrollment living May 25, 1901, born to citizens whose names appear upon the authenticated rolls of 1890 or upon the authenticated rolls of 1895 and entitled to enrollment as provided by the act of Congress approved March 1, 1901 (31 St. at L. 861), shall be placed on the rolls made by said commission. And if any such child has died since May 25, 1901, or may hereafter die, before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled to if living shall descend to his heirs as herein provided and be allotted and distributed to them accordingly."

Section 6 of the same act provides:

"The descent and distribution of land and money provided for in said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no persons of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

Such "heirs were vested with an interest in the property, which, in the absence of any provision to the contrary, was the subject of sale." (*Goat et al. v. United States, supra; Mullen et al. v. United States, supra.*) This section is illuminative in construing section 16 of the same act, which provides:

"The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed."

Section 6, c. 1323 (32 St. at L. 501), having repealed the "provisions of the act of Congress approved March 1, 1901 (31 St. at L. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation," provided that "the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas" then in force in the Indian Territory; "provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation; and provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49." Section 7 provided that:

"All children born to those citizens who are entitled to enrollment as provided by the act of Congress approved March 1, 1901 (31 St. at L. 861), subsequent to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said commission. And if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided and be allotted and distributed to them accordingly."

Said sections 7 and 8 shed light in the construction of said section 16 of the same act. The homestead of each citizen shall remain after the death of the allottee for the use and support of the children born to him after May 25, 1901; but if he have

no such issue then he may dispose of his homestead by will free from the limitation herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs free from such limitation, according to the laws of descent herein otherwise prescribed.

In the former part of section 16 it was provided that:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken or sold to secure or satisfy any debt or obligation or be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear."

Obviously the homestead descends at the death of the allottee, where no will has been made, according to the laws of descent prescribed in said act free from any limitation against alienation.

The Choctaw and Chickasaw homesteads are alienable by the heirs upon the death of the allottee. Section 12, c. 1362, 32 St. at L. 642; *Mullen et al. v. United States, supra.*

Section 8, c. 994 (32 St. at L. 982), of the Seminole Agreement provided that:

"The homestead * * * shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment. A separate deed shall be issued for said homestead and during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof."

Section 13, c. 1375, of the Cherokee Agreement (32 St. at L. 716, 717), provides:

"Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment. Separate certificate shall issue for said homestead. During the

time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him."

Upon the authority of *Mullen et al. v. United States,* the Seminole and Cherokee homesteads likewise become alienable upon the death of the allottee. Now to conclude that the five-year limitation contained in the first paragraph of section 16, c. 1323, of the Supplemental Creek Agreement (32 St. at L. 503), remained on the land after the death of the allottee, would be to reach a conclusion at variance with the scheme in the allotment of the Five Civilized Tribes, and is not borne out by the context of said Supplemental Creek Treaty.

The same conclusion reached in this case has also been reached by Judge Campbell of the United States District Court of the Eastern District of Oklahoma. *In re Lands of Five Civilized Tribes,* 199 Fed. 811.

So far as *Barnes v. Stonebraker,* 28 Okla. 75, 113 Pac. 903, and *Sanders v. Sanders et al.,* 28 Okla. 59, 117 Pac. 338, are not in harmony with this opinion, the same are overruled.

It is clear to our minds that the deed was delivered, and that there is no conflict in the evidence that would require a submission of such question to the jury. This is not a suit to reform the deed and have it declared a conveyance for a life estate. If the deed had been for a life estate, and Rentie had an estate in fee, he could not retake the premises during his lifetime. The holder of the reversionary interest would be the only one that would be entitled to possession, which would be after his death.

All the Justices concur.