### SMITH v. SUMPSEY AND ROSIE.

No. 6819—Opinion Filed July 10, 1917.

(166 Pac. 1094.)

(Syllabus by the Court.)

**Indians—Indian Lands—Alienation.**

The restrictions upon alienation by citizens of the Seminole Nation made by the original Seminole Agreement (Act of July 1, 1898, c. 542, 30 Stat. L. 567), apply only to allotments made to living citizens in their own right, and not to allotments made on behalf of deceased persons under the authority of section 2 of the second Seminole Agreement (Act of June 2, 1900, c. 610, 31 Stat. L. 250).

Sharp, C. J., and Miley and Thacker, JJ., dissenting.

Error from District Court, Seminole County; Tom D. McKeown, Judge.

Action by Sumpsey and Rosie against T. H. Smith. From a judgment for the plaintiffs, defendant brings error. Reversed, with directions.

Fowler & Biggers and Cobb & Cobb, for plaintiff in error.

Frank H. Reed, for defendants in error.

OWEN, J. This is an action, brought in the district court of Seminole county, to recover an undivided one-half interest in certain lands and to quiet title to the same. The petition alleges that the land was allotted to Ya-fo-la-gee, a member of the Seminole Tribe of Indians; that Kissie Harjo, at the death of the allottee, inherited a one-half interest in same; that thereafter Kissie died, and the land was inherited by the defendants in error as the sole heirs of Kissie. The plaintiff in error, defendant below, claims title through a deed executed by Kissie Harjo on the 28th of August, 1905. The case presents but one question: Did the deed dated August 28, 1905, made by Kissie Harjo, a full-blood Seminole Indian, covering the allotment of Ya-fo-la-gee, deceased, convey title to the plaintiff in error, T. H. Smith? The exact date of the death of the allottee, Ya-fo-la-gee, is uncertain. The case appears to have been tried by the lower court on the theory that it was immaterial whether she died prior to, or after, receiving allotment. The contention is made by counsel for the defendants in error, plaintiffs below, that in either event the land was restricted by the provisions of the original Seminole Agreement (Act of July 1, 1898, c. 542, 30 Stat. L. 567), under the terms of which any contract for the sale of any part of any allotment made prior to the date of the patent is void. The petition alleges that the allotment was made during the life of the allottee. The defendant below, in his answer, alleged the allottee died subsequent to her enrollment, but prior to receiving allotment. The court, in his finding of facts, says:

"The court finds that the allotment was selected on the 4th day of November, 1901, and that she was allotted and treated as one who was deceased. The court is unable to determine what the exact date of her death was, whether she died prior to, or subsequent to, November 4, 1901."

In his conclusions of law the court says:

"The court concludes as a matter of law that the original Seminole Agreement approved July 1, 1898, providing, among other provisions, that, 'All contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void,' was a positive restriction upon the allotment of the Seminoles; and, except as to the homestead of an allottee who has selected his allotment before death, decided in Stout v. Simpson, the heirs of the deceased in this case were without power to alienate the land in controversy until after the passage of the Act of Congress of April

26, 1906, there being no homestead in this allotment."

Judgment was rendered below for the plaintiffs, defendants in error here. The defendant below brings the cause here.

We think it was material whether the allottee died prior, or subsequent, to receiving her allotment. If she died after allotment, under the holding in the cases of Stout v. Simpson, 34 Okla. 129, 124 Pac. 754, and Lula v. Powell, 64 Okla. 200, 166 Pac. 1050, the deed in question passed title to Kissie's interest in the homestead portion of the allotment, but was void as to the surplus. If the allottee died prior to receiving allotment, the deed passed title to her interest in the entire allotment, including both homestead and surplus.

The original Seminole Agreement provides that all lands belonging to the tribe shall be divided among the members of the tribe, giving to each the right to select his allotment so as to include any improvements owned by him at the time. It made no provision for the allotment of any land to the heirs of any member of the tribe dying prior to allotment. The language relied upon by counsel for the defendants in error, "all contracts for the sale, disposition or incumbrance of any part of any allotment made prior to the date of the patent, shall be void," is found in this agreement immediately following the paragraph providing for the allotment of all lands belonging to the Seminole Tribe, and does not apply where the allotment was made after the death of the allottee. In this treaty Congress was dealing with the lands to be allotted to the members of the tribe living at the time of the allotment. In the second Seminole Agreement (Act of June 2, 1900, c. 610, 31 Stat. L. 250), provision was made for the allotment of land after the death of the allottee. Section 2 of this act is as follows:

"If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly."

This section is very similar to section 28 of the original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. L. 861), section 22 of the Choctaw - Chickasaw Supplemental Treaty (Act July 1, 1902, c. 1362, 32 Stat. L. 641), and section 20 of the Cherokee Treaty (Act July 1, 1902, c. 1375, 32 Stat. L. 716). Their purpose and general nature are not different. Bruner v. Sanders, 26 Okla. 673, 110 Pac. 730.

In the case of Skelton v. Dill, 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198, it was held that lands in the Creek Nation allotted after the death of the allottee, under section 28 of that treaty, passed to the heirs free from restrictions; that the restrictions imposed under the other sections of the treaty did not apply to allotments made after the death of the allottee. To the same effect, under this treaty, is Welty v. Reed, 231 Fed. 930, 146 C. C. A. 126; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310; Rentie v. McCoy, 35 Okla. 77, 128 Pac. 244; Deming Investment Co. v. Bruner Oil Co., 35 Okla. 395, 130 Pac. 1157.

In the case of Greenlees v. Wettack, 43 Okla. 16, 141 Pac. 282, the identical question was presented to this court under the Cherokee Treaty. It was held that the heirs took the land, under section 20, free from restrictions. In the case of Greenlees v. Morris, 239 U. S. 627, 36 Sup. Ct. 163, 60 L. Ed. 474, the United States Supreme Court, in construing the Cherokee Treaty, held to the same effect; the allotment having been made after the death of the allottee.

In the case of Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, it was held that lands, under section 22 of the Choctaw-Chickasaw Treaty, were taken by the heirs without restriction; and that section 16 of that treaty, which provides the land shall not be alienable until after the issuance of patents, has no application where the Indian died before receiving an allotment.

That Congress never intended the issuance of patents should be a restriction running with the land is evident from the language found in section 19 of the act of April 26, 1906, c. 1876, 34 Stat. L. 137, as follows:

"That conveyances heretofore made by members of any of the Five Civilized Tribes subsequent * * * to removal of restriction, where patents thereafter issue, shall not be deemed or held invalid solely because said conveyances were made prior to issuance and recording or delivery of patent or deed. * * *"

Counsel for defendants in error, in his brief, expresses his willingness to rest this case on the holding of this court in the case of Stout v. Simpson, supra. The court below treated this case as one in which the allotment was selected after the death of the allottee, but failed to make the distinction between the question presented in Stout v. Simpson and this case. It was admitted in Stout v. Simpson that the allotment was made during the life of the allottee. It was held the death of the allottee, under the Act

of March 3, 1903, c. 994, 32 Stat. 982, removed the restrictions on the homestead, but the restrictions contained in the original agreement applied to the surplus, the allotment having been made under the original agreement, and prior to the death of the allottee. In that case it was held the restrictions did not apply to leases made by the heirs of the allottee.

Counsel for defendants in error relies, also, on the cases of Marcy v. Board of County Com'rs, 45 Okla. 1, 144 Pac. 611, and McGeisey v. Board of Com'rs, 45 Okla. 10, 144 Pac. 614. The question under consideration in those cases was whether land held by full-blood Indian heirs was taxable. The cases turned on whether the land was subject to taxation within the meaning of the terms of the act of May 27, 1908, c. 199, 35 Stat. 312, providing that all land from which restrictions have been removed shall be subject to taxation. This court held the land was not alienable except with the approval of the county court, and that the necessity of that approval was such a restriction as to render the land nontaxable.

The judgment of the lower court is reversed, and the cause remanded, with directions to proceed further in accordance with the views herein expressed.

TURNER, HARDY, BRETT, and RAINEY, JJ., concur. SHARP, C. J., and THACKER and MILEY, JJ., dissent. KANE, J., absent, not participating.

MILEY, J. (dissenting). I fully appreciate the futility, under ordinary circumstances, of a dissenting opinion. Heretofore, in the few instances in which I was unable to concur in the conclusion of the majority of the court, I was content merely to note my dissent. In this instance, however, after an extended investigation and careful consideration of the question decisive of this case, I am so clearly of the opinion that the majority have reached the wrong conclusion that I feel I should express my own views on the question.

I think that the trial court was right in holding that it is immaterial whether the allotment was made before or after the death of the citizen to whom, or in whose right, it was made, since both classes of allotments are within the prohibition contained in the original Seminole Agreement against alienation prior to date of patent. Such holding is in accord with the previous decisions of this court construing the Seminole allotment acts, to which I shall refer later. The decision of the majority seems to be based upon the holding in Mullen v. United

States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834, construing the Choctaw-Chickasaw Agreements; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310, Rentie v. McCoy, 35 Okla. 77, 128 Pac. 244; Deming Investment Co. v. Bruner Oil Co., 35 Okla. 395, 130 Pac. 1157, and Welty v. Reed, 231 Fed. 930, 146 C. C. A. 126, construing the Creek Agreements; and Greenlees v. Morris, 239 U. S. 627, 36 Sup. Ct. 163, 60 L. Ed. 474, and Greenlees v. Wettack, 43 Okla. 16, 141 Pac. 282, construing the Cherokee Treaty. Those cases definitely and finally decide that the restrictions imposed on alienation by the Choctaw-Chickasaw, Creek, and Cherokee Allotment Acts, apply only to allotments made to living members or citizens of those tribes, and that such restrictions are not applicable to allotments made in the right of an enrolled citizen or member of those tribes after his death.

It seems to me that, in following those decisions as decisive of this case, the majority ignore or refuse to notice the very marked difference in the nature of the restrictions imposed by the Seminole Allotment Act and those of the other tribes, and fail to observe that the reasons which controlled the decision in those cases have no bearing on this case. By assuming that the question involved in this case is ruled by the authorities mentioned, the majority have reached a conclusion clearly at variance with the plain meaning of the language and the intent of the provision of the Seminole Agreement referred to.

In the case of Mullen v. United States, supra, after stating that, under the Choctaw-Chickasaw Supplemental Agreement, the scheme of allotting the land defined two classes of cases, (1) "allotments made to members of the tribes, and to freedmen, living at the time of allotment, and (2) allotments made in the case of those whose names appeared upon the tribal rolls, but who had died after the ratification of the agreement and before the actual allotment had been made," it was pointed out that, with respect to allotments to living members, it was provided by section 12 that each member should, at the time of the selection of his allotment, designate as a homestead out of said allotment a certain portion thereof. The court then quoted the sections imposing restrictions on alienation. In the case of the land designated as a homestead, the provision was:

"Shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate of allotment." Section 12.

In case of the surplus, the provision was:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent: provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value." Section 16.

The court then observed and commented upon the difference in the character of restriction imposed on the homestead and surplus lands, which, in the case of the homestead, terminated on the death of the allottee within the prescribed period, while, in case of the surplus, the restriction continued after his death against alienation by the heirs for the periods prescribed.

It will be further noted that it was required that the homestead be designated at the time the allotment was selected, and the restriction thereon operated from the date of the certificate of selection. Section 22 of that agreement, providing for the allotments in the second class of cases—that is, where a person whose name appeared upon the rolls died before receiving his allotment—was next quoted by the court. Whether a homestead should be designated out of such an allotment was a question then considered, and, having reached and announced the conclusion that it should not, the opinion then proceeded as follows:

"We have, then, a case where all the allotted lands going to the heirs are of the same character, and there is no restriction upon the right of alienation expressed in the statute. Had the lands been allotted in the lifetime of the ancestor, one-half of them, constituting homestead, would have been free from restriction upon his death. The only difficulty springs from the language of paragraph 16, limiting the right of heirs to sell 'surplus' lands. But, on examining the context, it appears that this provision is part of the scheme for allotments to living members, where there is a segregation of homestead and surplus lands respectively. Whatever the policy of such a distinction which gives a greater freedom for the disposition by heirs of homestead lands than of the additional lands, there is no warrant for importing it into paragraph 22, where there is no such segregation. It would be manifestly inappropriate to imply the restriction in such cases, so as to make it applicable to all the lands taken by the heirs, and there is no occasion, or authority, for creating a division of the lands so as to impose a restriction upon a part of them."

So the court concluded, as I understand

the opinion, that the only restrictions imposed by the act, from the time of selection of the allotment, being of one character on the homestead, which terminated at the death of the allottee, and of a different character on the remainder of the allotment, which did not so terminate, were by their terms applicable only to allotments susceptible of division into homestead and surplus, and, there being no warrant for designating a homestead in lands allotted under section 22, such allotments therefore passed to the heirs without restriction upon alienation. Unless I have wholly failed to understand the reasoning of the court, a different conclusion would have been reached had there been a provision in the act which operated on the entire allotment or any part of any allotment.

The other cases cited and relied upon by the majority follow Mullen v. United States. The Cherokee Treaty, 32 Stat. L. 716, provides, in section 13, for the designation of a homestead out of the allotment by each member of the tribe, "at the time of the selection of his allotment," which shall be inalienable during the lifetime of the allottee, not exceeding 21 years "from the date of the certificate of allotment." Section 15 provides that lands allotted to the members of the tribe, except such land as is set aside to each for a homestead, shall be alienable in 5 years after issuance of patent. These sections are, so far as the question under consideration is concerned, practically the same as sections 12 and 16 of the Choctaw-Chickasaw Supplemental Agreement. Section 20 of the Cherokee Treaty is the provision (similar to section 22, Choctaw-Chickasaw Supplemental Agreement) for allotments in cases of enrolled citizens who died before receiving their allotments. As in the case of the Choctaws and Chickasaws, there was no provision for segregating part of such an allotment as a homestead. Therefore, the decision in Mullen v. United States was plainly applicable and was properly followed in Greenlees v. Morris, supra, and Greenlees v. Wettack, supra.

In the Original Creek Agreement, 31 Stat. L. 861, it was provided that lands of the tribe should be allotted "among the citizens of said tribe." Section 4 provided for selections of allotments of minors. Section 5 provided for disposition of improvements on excessive holdings and section 6 confirmed certain allotments previously made. Then section 7 (which is practically the same as section 16 of the Supplemental Creek Agreement, act June 30, 1902, c. 1323, 32 Stat. L. 500) imposed restrictions on "lands allotted to citizens hereunder," and also provided that "each citizen shall select from his allotment" a tract as a homestead, upon which a different restriction was imposed. While these agreements did not specify when selection of the homestead should be made, necessarily the same was required at the time of selection of the allotment, since the allottee was to have a separate deed for his homestead (section 7) and it was provided that deeds should be executed and delivered immediately (section 23). By section 28, amended by section 6 of the Supplemental Agreement, provision was made for allotments in the case of those who died before receiving same. There was no provision for selecting a homestead out of an allotment made under this section.

This court, in the opinion in Rentie v. McCoy, supra, without stating the reason therefor, said that section 16 of the Creek Supplemental Agreement was a part of the scheme of allotment for living members, and not where they died prior to allotment, and held upon authority of Mullen v. United States, supra, which was quoted at length, that allotments made under section 28 of the Creek Agreement passed to the heirs free of all restrictions.

However, in Deming Investment Co. v. Bruner, supra, in an opinion filed shortly after that in Rentie v. McCoy, this court treated the question more fully. In that opinion, after quoting from the opinion in Mullen v. United States, stating that there was no reason for implying a requirement that there should be a designation of a portion of the lands allotted after death of the member entitled thereto as a homestead, said:

"This expression of that court should be taken as high authority, if not decisive, that the portion of section 7 of the Original Creek Agreement and of section 16 of the Supplemental Creek Agreement, supra, requiring the selection of a homestead of 40 acres by each citizen out of his allotment and imposing restrictions upon its alienation for a period of 21 years, has no application to allotments made under section 28; and, if those sections apply at all to allotments made under section 28, they do so only in part. But there is no language in either section 7 of the Original Treaty, or in section 16 of the Supplemental Treaty, or in section 28, specifically expressing an intent that any of the provisions of the two first-named sections shall apply to allotments made under the last section to the heirs of persons who died subsequent to the 1st day of April, 1899, but before receiving their allotments. Two classes of allotments of land are provided for by the treaty: First, an allotment to each member of the tribe that he is entitled to receive because of his membership in the tribe and

his interest in the tribal property; and, second, an allotment which the treaty deems just for the heirs to receive, not because they are members of the tribe, but because they are heirs of a person who would have been entitled to take an allotment had he lived until the ratification of the treaty. It was with the former of these classes of allotments, we think, section 16 of the Supplemental Treaty and its counterpart, section 7, of the Original Treaty, intended to deal, and that it intended to divide the lands embraced in such allotments into two classes, consisting of those upon which there is a restriction upon the alienation for a period of five years from the ratification of the treaty, and of those upon which there is restriction upon the alienation for a period of 21 years; but section 28 provides for no such division of the lands allotted thereunder, and makes no reference to restrictions upon the alienation thereof. An Indian having died before taking an allotment, the land he was entitled to receive as his allotment descends directly to his heirs under the law of descent and distribution named, and shall be allotted and distributed to them accordingly. The land allotted to the heirs of deceased is neither homestead nor surplus; and there is no more reason for applying the restrictions upon alienation of the surplus to this entire allotment than there is to apply the restrictions upon the alienation of homesteads."

So it is seen that this court reached the conclusion it did (contrary to its earlier decisions) upon the authority of Mullen v. United States, by holding that the five-year restriction contained in section 7 of the Original and section 16 of the Supplemental Creek Agreement applied only to the surplus, and not the homestead portions of the allotment, and thereby making it possible to assimilate those sections to sections 12 and 16 of the Choctaw-Chickasaw Agreement, in so far as a different restriction was imposed on the surplus and on the homestead, neither of which was applicable to the entire allotment.

In Skelton v. Dill, supra, the Supreme Court of the United States said, referring to its decision in Mullen v. United States:

"We do not perceive anything in the acts relating to the Creek lands which calls for a different conclusion."

So we see it was held that allotments made under section 28 of the Creek Agreement passed to the heirs free of restrictions for the same reason that it was so held as to allotments under section 22 of the Choctaw-Chickasaw Agreement.

Let us now refer to the provisions of the Seminole Agreements bearing on the question, and determine whether they are essentially different from those considered in the cases mentioned. The Dawes Commission entered into an agreement with the Seminole Commission on December 16, 1897, which was ratified by the Seminoles and incorporated into the act of Congress of July 1, 1898, 30 Stat. L. 567, which contained this provision:

"All lands belonging to the Seminole Tribe of Indians shall be divided into three classes, designated as first, second, and third class; the first class to be appraised at five dollars, the second class at two dollars and fifty cents, and the third class at one dollar and twenty-five cents per acre, and the same shall be divided among the members of the tribe so that each shall have an equal share thereof in value, so far as may be, the location and fertility of the soil considered; giving to each the right to select his allotment so as to include any improvements thereon, owned by him at the time and each allottee shall have the sole right of occupancy of the land so allotted to him, during the existence of the present tribal government, and until the members of said tribe shall become citizens of the United States. Such allotments shall be made under the direction and supervision of the Commission to the Five Civilized Tribes in connection with a representative appointed by the tribal government; and the chairman of said commission shall execute and deliver to each allottee a certificate describing therein the land allotted to him.

"All contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void."

This agreement contained further provisions for leasing allotments for agricultural and for mineral purposes, for the control and disposition of the townsite of Wewoka, for setting apart of a portion of the tribal funds for educational purposes, and also for setting apart land for district schools and churches; and then followed this further provision:

"When the tribal government shall cease to exist the principal chief last elected by said tribe shall execute, under his hand and the seal of the nation, and deliver to each allottee a deed conveying to him all the right, title and interest of the said nation and the members thereof in and to the lands so allotted to him, and the Secretary of the Interior shall approve such deed, and the same shall thereupon operate as relinquishment of the right, title, and interest of the United States in and to the land embraced in said conveyance, and as a guaranty by the United States of the title of said lands to the allottee; and the acceptance of such deed by the allottee shall be a relinquishment of his title to and interest in all other lands belonging to the tribe, except such as may have been excepted from allotment and held in common for other purposes. Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity."

Other provisions were then set forth in the

agreement not material to the consideration of this case. It will be noted that no date was fixed after which children born to citizens should not be added to the rolls, and the rolls could not be closed and allotting commenced upon any given date. See Report of Commission to the Five Civilized Tribes for year ended June 30, 1899, p. 13. This difficulty was overcome by a second agreement entered into on October 7, 1899, and incorporated in an act of Congress approved June 2, 1900 (31 Stat. L. 250). This second agreement is in part as follows:

"First. That the Commission to the Five Civilized Tribes in making the rolls of Seminole citizens, pursuant to the act of Congress approved June 28, 1898, shall place on said rolls the names of all children born to Seminole citizens up to and including the 31st day of December, 1899, and the names of all Seminole citizens then living; and the rolls so made, when approved by the Secretary of the Interior, as provided by said act of Congress, shall constitute the final rolls of Seminole citizens, upon which the allotment of lands and distribution of money and other property belonging to the Seminole Indians shall be made, and to no other persons.

"Second. If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father."

After this agreement had been ratified the commission completed the rolls, and the allotment of the land in that nation was commenced June 1, 1901, and completed June 28, 1902. See Report of the Commission to the Five Civilized Tribes for the year ending June 30, 1905, p. 52. An allotment was made to each citizen whose name appeared upon the approved roll prepared pursuant to the first paragraph of the second agreement. If the citizen whose name appeared upon that roll had died prior to the time the allotment was set apart, by virtue of the second paragraph of that agreement, the same descended and was allotted to his heirs.

The scheme of allotment in the Seminole Tribe as developed by both agreements, as in the case of the other tribes, provided for allotments to two classes: (1) Those to enrolled citizens, living at the time of allotment; and (2) those in the right of enrolled citizens who died before receiving the allotment to which they would have been entitled if living. The reasons assigned for holding that no part of an allotment made in the other four tribes in the right of deceased citizens should be designated as a homestead apply to the Seminoles. So far, the scheme of allotment in the Seminole is practically the same as that of the other tribes. But other than that there is no similarity. I have already called attention to the fact that, in the Choctaw-Chickasaw and the Cherokee Agreements, there were provisions expressly requiring that the homestead in allotments to living members be designated at the time of the selection of the allotment, and that such is necessarily implied under the Creek Agreements. In the case of the Choctaws and Chickasaws, it was provided that, "as soon as practicable after the completion of allotments," patents should be executed and delivered to each of the allottees. Section 29, 30 Stat. L. 495. In the Cherokee Treaty, it was provided that:

"When any citizen receives his allotment of land, or when any allotment has been so ascertained and fixed that title should under the provisions of this act be conveyed, the principal chief shall thereupon proceed to execute and deliver to him a patent." Section 58.

Reference has already been made to a similar provision in the Original Creek Agreement. Section 23. But in the case of the Seminoles, under the express terms of the first agreement, patents were not to be executed and delivered until the "tribal government shall cease to exist." The cessation of that government was an event in contemplation, but when it should occur was not then definitely fixed. See Report of Commission to the Five Civilized Tribes for year ended June 30, 1904, p. 30. It was not provided in the case of the Seminoles that homesteads should be designated at the time of the selection of the allotment; but, under the scheme of allotment of the lands of that tribe, this was not to be done until the deeds were executed. The agreements were so construed by the commission charged with their enforcement. In their report of June 30, 1904, the commission said:

"The Seminoles were not, at the time they selected their allotments, required to designate the forty-acre tracts which they desired to have reserved as homesteads, it being thought that the agreement contemplated the making of such designation when deeds should be issued at the expiration of the tribal government—an epoch in the destiny of the tribe foreseen but not definitely provided for at that time." Page 30.

Nothing was in fact done towards designating homesteads for more than two years after all allotments to citizens on the original rolls had been completed. It appears from their report for the year ending June 30, 1905, p. 53, that a land office was opened at Wewoka from September 1, 1904, to October 31, 1904, during which time the allottees were afforded an opportunity to designate these 40-acre homestead tracts to the end that the commission might have "its records in such condition that deeds could be expeditiously issued at the proper time." The expiration of the tribal government had then been fixed by act of Congress March 3, 1903, c. 994, sec. 8, to occur not later than March 4, 1906 (32 Stat. L. 982, 1008). By later acts of Congress, the existence of the tribal government was continued indefinitely. Act March 2, 1906, 34 Stat. L. 822; section 28, Act of April 26, 1906, c. 1876, 34 Stat. L. 137. Authority to execute deeds prior thereto was conferred (section 6, act of April 26, 1906), but which was not exercised until after the passage of the act of May 27, 1908. So it appears that there was no separation of the allotments of the living Seminoles, at the time of selection, into homestead and surplus, as in the case of the other tribes, and the scheme did not originally contemplate any such division until patents were issued at the expiration of tribal government, and lands allotted to living citizens, as well as those made in the right of those who had died, were, at the inception of the allotment and continued for years to be, all of the same character.

The provision in the First Seminole Agreement that "all contracts for sale, disposition, or incumbrance of any part of any allotment made prior to date of patent shall be void," is not and was not intended as a restriction on the portion of the allotment other than the homestead only, but as a restriction on all the lands allotted. That provision is equally as applicable to the lands allotted after death as that to living citizens. It is therefore apparent that the cases cited and relied upon by the majority are not controlling.

But the majority say in the opinion in this case that:

This provision "is found in this (the First or Original) Agreement immediately following the paragraph providing for the allotment of all lands belonging to the Seminole Tribe, and does not apply where the allotment was made after the death of the allottee. In this treaty Congress was dealing with the lands to be allotted to the members of the tribe living at the time of the allotment."

It is true that the first agreement seems to contemplate allotments only to living citizens, at least no express provision had been made, and was not until the second agreement was ratified, for allotments in case of those citizens entitled thereto, but who died before the selection was made. But does that preclude the operation of the provision against alienation on such allotments? I think not. No allotments, even to living members, had then been made, and the provision was not intended to operate only on allotments or things then in existence, but it was intended and could only operate prospectively; that is, on allotments thereafter coming into existence. This court held, in line with other authorities, in Charles v. Thornburgh, 44 Okla. 379, 144 Pac. 1033, in the opinion by Commissioner, now Chief Justice, Sharp, that:

"Where the language of a statute, as in the present case, is in general terms, and in words of the present tense, the statute will, as a general rule, be construed to apply not only to things and conditions existing at its passage, but will also be given a prospective interpretation, by which it will apply to such as come into existence thereafter."

See, also, Smith v. Bell, 44 Okla. 370, 144 Pac. 1058; Bennett v. State, 47 Okla. 503, 150 Pac. 198; and Roberts v. Casner, 51 Okla. 614, 152 Pac. 121.

The restriction which it was held in the cases relied on by the majority as not applicable to allotments made after death, in addition to being limited to surplus lands, was in terms imposed by the Choctaw-Chickasaw Agreement on "lands allotted to members of said tribes," by the Creek Agreements on "lands allotted to citizens hereunder"; and by the Cherokee Treaty on "all lands allotted to members of said tribe." But the language of the provision against alienation in the Seminole Agreement is most general. It says, "any part of any allotment," without reference to whom or when made. Referring to this provision, this court said in Stout v. Simpson, 34 Okla. 129, 124 Pac. 754:

"It would be difficult to employ words having a broader meaning. The words 'any part' were intended, we think, to apply either to the homestead or surplus allotment, and the words 'any allotment' had reference to any and all allotted lands whether set apart directly to the allottee, or that which descended to the heirs of the allottee upon his or her death. The word 'allotment' as used is not necessarily confined to the individual allotment of the living allottee. It may none the less be described as an allotment, though the allottee be dead, and the adjective 'any' preceding the word 'allotment' precludes all limitation upon the kind or class of allotment intended to be included."

7—64

This court held, in Moffett v. Conley, 63 Okla. 3, 163 Pac. 118, in an opinion by Sharp, C. J., followed in Bruner v. Nordmeyer, 64 Okla. 163, 166 Pac. 126, in an opinion by Owen, J., that the provisions of section 22 of the Act of April 26, 1906, in part as follows: "That the adult heirs of any deceased Indian of either of the Five Civilized Tribes, whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribes to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent," and also that "all conveyances made under this provision by heirs who are full-blood Indians, are to be subject to the approval of the Secretary of the Interior, made under such rules and regulations as he may prescribe"—were broad enough to include the heirs of those who died before allotment, as well as those dying after, and that, after the passage of that act, a conveyance by a full-blood Indian heir, of a citizen who died before receiving his allotment, did not pass title to his interest in such allotment without the approval of the Secretary of the Interior. I confess that there is reason for difference of opinion as to whether that section is applicable to such allotments made in the right of a deceased citizen after his death, and whether it was so intended. But I am wholly unable to understand how one, who entertains the view expressed in those decisions, can consistently say that the language of the Seminole Agreement restricting the alienation of "any part of any allotment" is not sufficiently comprehensive to include allotments made after death as well as those before.

The allotments, while of two classes, were made, those of one class to living persons identified as citizens under the provisions of the first paragraph of the second agreement, and those of the second class being in the right of deceased citizens for the benefit of their heirs identified under the second paragraph of the second agreement. Lands selected by, or set apart for, those entitled thereto under either paragraph of the second agreement, are an allotment. Allotments of both classes were of the same character. The restriction against alienation prior to date of patent was in terms as applicable to the one class as the other. There is no warrant for the contrary holding of the majority. Their holding is contrary, not only to the letter of the provision, but also to the intent and purpose of this inhibition against alienation and incumbrance prior to date of patent, so far as I have been able to gather the same.

A careful reading of the Seminole Agreement will disclose, as was said by the com-

mission in its report for the year ending June 30, 1904, p. 30:

"Apparently the purpose of the Seminoles was to make an agreement which would provide for the division of the tribal property and change the system of land tenure with the least possible disturbance to the social conditions and customs of the tribe."

No good reason has ever been suggested to me, and I can think of none, for the existence of an intention to restrict allotments made to living enrolled members of the Seminole Nation, and not those in the right of deceased citizens for benefit of their heirs. Such allotments were made for the benefit of heirs who were themselves Seminole citizens. Any reason for restricting one class of allotments applies equally to the other. The deed under which plaintiff in error claims was executed August 28, 1905, the restriction upon alienation had not been removed at that time, and I can see no possible application of the portion of section 19 of the Act of April 26, 1906, quoted by the majority.

I think the view I have herein undertaken to express is that entertained by this court when it decided McGeisey v. Board of Com'rs of Seminole County, 45 Okla. 10, 144 Pac. 614. It is true, the question in that case was whether the lands were taxable; but whether the land was taxable turned upon whether the alienation was unrestricted. That case was decided the same day and upon the authority of Marcy v. Board of Com'rs of Seminole County, 45 Okla. 1, 144 Pac. 611, and the syllabus was the same in both cases. In one paragraph thereof it was said:

"The power to tax inherited Indian land is coincident with and dependent upon the removal of restrictions upon alienation."

In the Marcy Case, the land had been allotted to and in the lifetime of the enrolled citizen, who died thereafter, and title passed to his full-blood heir. It was held in that case that up to the passage of the act of April 26, 1906, the restriction was that heretofore quoted from the First Seminole Agreement, and thereafter the same was restricted under section 22 of that act, which was superseded by section 9 of the act of May 27, 1908. In the McGeisey Case it was contended by the defendant in error therein, as it is by the plaintiff in error here, that the land involved therein, having been allotted under paragraph 2 of the second agreement, the same passed to the heirs free of the restrictions imposed by the first agreement; but the court said in the opinion:

"Every proposition involved in this case has been recently decided by this court in the

case of Marcy v. Board of County Commissioners of Seminole County."

From which I understand that so far as restriction upon alienation by the heirs is concerned, and hence, whether the land was subject to taxation, this court, at that time, saw no distinction, and refused to make one, between lands allotted to a citizen of Seminole Nation, who died thereafter, having full-blood heirs who inherited the land, and lands allotted after the death of the enrolled citizen, equitable title to which vested immediately upon allotment in the heirs of the citizen who would have been entitled to the allotment had he lived.

Believing, as I do, that the conclusion of the majority is supported by neither reason nor authority, and contrary to the plain meaning and intent of the law, I must dissent.

I am authorized to say that SHARP, C. J., and THACKER, J., concur in the views herein expressed.