## WYNN, County Treas., v. FUGATE.

No. 21138. Opinion Filed June 2, 1931.

E. E. Heyl, Co. Atty., and B. B. Foster, Asst. Co. Atty., for plaintiff in error.

Fred B. Woodard, for defendant in error.

ANDREWS, J. Lillie Fugate, defendant in error, hereinafter referred to as plaintiff, brought an action in the district court of Washington county to restrain the plaintiff in error, hereinafter referred to as defendant, from selling certain land at a tax resale, and recovered judgment as prayed for.

The record shows that the land was a part of the surplus allotment of George Fugate, who was enrolled as a half-blood on the Cherokee rolls, and that he died seized and possessed of the same, leaving as his sole and only heirs at law his mother, the plaintiff, a full-blood, and his father, of no Indian blood; that the land was partitioned in an action in the district court of Washington county and the portion thereof involved in this suit was set aside by that court to this plaintiff; that the land was thereafter assessed, placed upon the tax rolls, and sold to the county, and that the county treasurer is about to sell the same at a resale.

The defense was that the land was unrestricted land after July 27, 1908, under the provisions of the Act of Congress of May 27, 1908 (35 Stat. 312), and as such subject to taxation, or, if that was not true, that one-half thereof having been acquired by the plaintiff from her non-Indian husband by partition was subject to taxation. Under the view we take of the law applicable, it is not necessary for us to consider the effect of the partition proceeding and the title acquired thereby.

The question to be determined is whether or not land allotted as a surplus allotment to a half-blood Cherokee Indian, which passed upon his death to a full-blood Indian heir while the Act of Congress of May 27, 1908, was in effect, may be sold for taxes levied after title passed to the full-blood Indian heir and while the title thereto is retained by the full-blood Indian heir.

If a full-blood Cherokee Indian heir had inherited the surplus allotment of a full-blood Cherokee Indian allottee while the Act of May 27, 1908, was in effect, the answer to the question would have been less difficult. Here the allottee was not a full-blood Cherokee Indian. He was only a half-blood Cherokee Indian.

We are not here concerned with the question of whether or not the land involved in this action may be conveyed without the approval of the court having jurisdiction of the settlement of the estate of the deceased allottee or the question of whether a resale tax deed is a conveyance requiring such approval. Those issues are not here presented and they are not here decided.

Though the land in question be subject to restrictions upon alienation, as here contended but not here decided, and though the full-blood Cherokee Indian heir be subject to restrictions upon the sale of the land, a distinction recognized but not here decided, the land may be subject to taxation. The distinction between restrictions on land or the alienation thereof and restrictions on taxation is clear, notwithstanding the statement of this court in Marcy v. Board of County Commissioners, 45 Okla. 1, 144 Pac. 611, that "The power to tax inherited Indian land is coincident with and dependent upon the removal of restrictions upon alienation," and the decisions of this court in McGeisey v. Board of Commissioners, 45 Okla. 10, 144 Pac. 614, which followed the Marcy Case without discussion of the law, Watkins v. Howard, 64 Okla. 166, 166 Pac. 706, and Combs v. Johnson, 92 Okla. 189, 218 Pac. 1098. See United States v. Brown, 8 Fed. (2nd) 564.

In Marcy v. Board of Commissioners, supra, the action was to annul and cancel certain tax sale certificates and to restrain the collection of taxes assessed for the years 1910 and 1911 against land which consisted of the surplus allotment of a full-blood Seminole Indian which had been inherited from him by his full-blood Seminole Indian heirs. It will be noted that the restrictions upon that land had not been removed under the provisions of section 1 of the Act of May 27, 1908, or in any other manner prior to the death of the allottee, and that the restrictions thereon had been removed by the death of the allottee under the provisions of section 9 of the act, subject to the proviso contained in section 9 thereof. The finding of this court was a general one, but it was based upon one proposition, stated in the opinion as follows:

"The sole question determinative of this case is: Are lands allotted to a full-blood member of the Seminole Tribe of Indians, exclusive of his homestead, inherited at his death by his full-blood Indian heirs exempt from taxation while owned and held by such heirs?"

The facts there presented differ from the facts presented here in three important particulars. There the allottee was a Seminole Indian, while here the allottee was a Cherokee Indian. Different treaties and federal acts governed those tribes of Indians. There the allottee was a full-blood Indian, while here the allottee was a half-blood Indian. A different rule applies to half-blood Indians from that applying to full-blood Indians. There the restrictions upon the alienation of the land had not been removed at the time of the death of the allottee, while here the restrictions upon the alienation of the land had expired prior to the death of the allottee. There, there was no question as to whether or not the proviso to section 9 of the Act of May 27, 1908, affected land the restrictions

upon the alienation of which had been removed prior to the death of the allottee, while here that question is presented. The opinion in the Marcy Case is in no wise decisive of the issue presented here, notwithstanding the general language used therein. It failed to consider section 1 and section 4 of the Act of May 27, 1908, section 1 of which provides:

"That from and after 60 days from the date of this act, the status of the lands allotted heretofore, or hereafter, to allottees of the Five Civilized Tribes, shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as inter-married whites, as freedmen, and as mixed-blood Indians having less than half Indian blood, including minors, shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed-blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions"

—and section 4 of which provides:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes * * *"

—which sections are controlling as to the issues presented here unless there is some treaty provision between the Indian Tribe and the United States government to the contrary. By those sections it was provided that the surplus allotment of a half-blood Indian shall be free from all restrictions and that the same shall be subject to taxation. That those sections were not considered in the Marcy opinion is evidenced by the language used therein. The court said:

"Without doubt Congress, in the absence of a valid prior grant vesting in an allottee and his heirs a property right of exemption from taxation, had the power to provide, as was done in the act of 1908, supra, that all restrictions upon alienation of lands allotted to a member of an Indian Tribe should be removed by his death, and that such lands should thereupon become taxable."

It will be noted that the act provides that land, the restrictions upon which have been removed other than by death, shall be taxable. The opinion nowhere considers the effect of section 1 of the act. The opinion further states:

"From the language of the act, 'that all land from which restrictions have been or shall be removed shall be subject to taxation,' it is clear that the power of the state to tax the lands in question is coincident with and dependent upon the unrestricted right of the owner to sell the same. The power to tax, and right to convey, are granted by the same act, become effective upon the same condition, and at one and the same time; the former cannot exist without the latter."

The quotation therein is from section 4 of the act. Much confusion has arisen from the quotation of only the last sentence in that paragraph of the opinion. We agree that, under the facts in that case, it is clear that the power of the state to tax the lands in question is coincident with and dependent upon the unrestricted right of the owner to sell the same, but that statement has no reference to the facts in the case at bar. In the case at bar the power to tax and the right to convey were not granted by the same act and they did not become effective upon the same condition and at one and the same time. As to the land in question here, the power to tax was granted by section 4 of the act. The right to convey was not granted by any provision of the act. That right existed prior to the adoption of the act. Neither the power to tax nor the right to convey was dependent upon the death of the allottee in this case. The rule stated and herein quoted shows that it was based upon the facts in that case and it is in no wise controlling as to the facts in this case.

The decision in McGeisey v. Board of Commissioners, supra, followed the rule announced in the Marcy Case without discussion of the law, although the facts were materially different. In the McGeisey Case the allottee was a half-blood Seminole Indian who had died in December, 1900, before receiving his allotment. The allotment went to his restricted Seminole Indian mother, who held the same until 1912, when the attempt was made to subject it to taxation for that year. The conclusion reached by this court on the facts in that case was correct. That land was restricted at the time of the attempted taxation. Smith v. Sumpsey and Rosie, 64 Okla. 186, 166 Pac. 1094. The restrictions thereon had not been removed and section 4 of the act did not operate to impose the right of taxation on that land.

In Combs v. Johnson, supra, the allotment was to a full-blood Creek Indian, who died before enrollment, and the land went to his heirs who were full-blood Creek Indians. They attempted to sell the land while the Act of April 26, 1906, was in effect without the approval of the Secretary of the Interior. Thereafter they made another conveyance of the land while the Act of May 27, 1908, was in effect, and that conveyance was

approved by the county court having jurisdiction of the estate. The court therein held that the title passed by the latter deed and that the land was not subject to taxation prior to the approval of that deed.

In Watkins v. Howard, supra, the allotments were made to Choctaw Indians and the heirs were full-blood Choctaw Indians. The decision was based upon section 16 of the Choctaw-Chickasaw Treaty, which imposed restrictions which were not removed by the death of the allottee, but ran with the land and restricted alienation by the heirs for the period of time therein provided, requiring such alienation to be approved by the Secretary of the Interior.

It will be noted that in none of those cases was the allotment made to a Seminole Indian and none of the allotments therein involved were made to living half-blood Indians. In each of those instances where the land was held not to be subject to taxation, the land was in fact restricted at the time of the attempted taxation. In none of those cases had restrictions been removed under the provisions of section 1 of the Act of May 27, 1908, and section 4 of the Act of May 27, 1908, had no application in any of them.

From the beginning the United States government, as an attribute of its sovereignty, has exercised guardianship and plenary power and authority over Indians and their property and affairs. The United States Supreme Court has so repeatedly held. In United States v. Kagama, 118 U. S. 375, 30 L. Ed. 228, that court said:

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its law on all the tribes."

See, also, Stephens v. Cherokee Nation, 174 U. S. 445, 43 L. Ed. 1041.

In Marchie Tiger v. Western Investment Co., 221 U. S. 286, 55 L. Ed. 738, that court held:

"* * * It may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease."

When the Constitution of Oklahoma was in preparation there was included therein, for the advantage of the people of the state, section 5 of art. 10, which provides as follows:

"The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects."

But that constitutional provision must be interpreted in the light of section 1 of the Enabling Act which provides:

"That the inhabitants of all that part of the area of the United States now constituting the Territory of Oklahoma and the Indian Territory, as at present described, may adopt a Constitution and become the state of Oklahoma, as hereinafter provided: Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed."

That requirement was carried into the Constitution and made a part of section 6 of art. 10 thereof, in the following language:

"* * * And such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws, during the force and effect of such treaties or federal laws."

This court, in Schock, Co. Treas., v. Sweet, 45 Okla. 51, 145 Pac. 388, discussed the right of taxation of Indian lands and said:

"It is well to remember that the state of Oklahoma, as a sovereign, has plenary power to subject all property within her domain to taxation, except such property as may have been exempted by the Enabling Act, or unless restrained by the federal Constitution. If this property is not subject to the taxing power of the state, it must be by reason of some specific provision exempting it from taxation by a federal law or treaty with the Indian tribes, which provision the state has agreed to keep inviolate, or else is exempt by some provision in the Constitution. * * *

"In considering the purpose and, effect of the agreements between the government and these different tribes of Indians, and their effect upon the state, we must not lose sight of the fact that the state is bound only by such agreements wherein it specifically consented to be bound; and except where it expressly agreed to exempt Indian property from taxation, the right to tax remains unimpaired."

This court, in Gleason v. Wood, Co. Treas., 28 Okla. 502, 114 Pac. 703, discussing those rights, said:

"The people of the state, in the adoption of the terms of the Enabling Act, in effect, have disclaimed any right or authority to limit or affect the power of the government to make any law or regulation respecting Indians, their lands, property, or other rights which the government might have made, .had the territory embracing the same not been created into a state, and has held as exempt the property of the Indians in accordance with the treaties or federal laws relating thereto during the force and effect of the same. So that the general laws relating to the taxation of all property within the state, for the purposes of state and municipal government under the provisions of the Enabling Act and the Constitution, were suspended from operating upon these lands so long as they were held inalienable and exempt from taxation by the laws of Congress. On Oklahoma coming in as a state, it yielded the right to the federal government to legislate as to this property, of either absolving it from taxation, or, by removing the exemption, thereby bringing it within the operation of the general taxing system of the state. When, therefore, Congress acted and the exemption was removed, the state's power to tax by operation of law immediately attached. This, it occurs to us, is the extent, force, and effect of the provisions of the Enabling Act and the Constitution. The state entered into no contract with the Indian tribes or the members thereof. It made no agreement, and it received naught from them as a consideration, for the relief which they here demand. Its sole contract in reference to these matters was with Congress, wherein it agreed that it would recognize and respect its legislation. So long as Congress maintained the laws under which these lands were exempt, the state under this agreement was required to recognize the same; but when Congress repealed them, and rendered the lands the same as those of all other citizens of the state, there was no broken pledge on its part when it enforced the same laws with reference to these lands that it did on those of all others."

We are thus presented with the question of whether or not the land involved in this action is exempted from taxation by reason of any treaty stipulation existing between the Cherokee Indian Tribe and the United States government, or by reason of any federal law. If it is not, then, under the Constitution, it is subject to taxation.

The agreement between the United States and the Cherokee Indian Tribe, in section 14 thereof, provided that:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee, or his heirs, before the expiration of five years from the date of the ratification of this act"

—and in section 15:

"All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

The record in this case shows the land to have been unrestricted at the time of the death of the allottee. There is nothing in that agreement providing for exemption from taxation on surplus allotments. By the provisions of section 4 of the act, Congress provided that the land should be subject to taxation. After the Act of May 27, 1908, took effect, this land became, and during the lifetime of the allottee was, subject to taxation. Kidd v. Roberts, 43 Okla. 603, 143 Pac. 862, and Rider v. Helms, 48 Okla. 610, 150 Pac. 154, the syllabus of which is as follows:

"The surplus, unrestricted allotments of duly enrolled Cherokee citizens, less than full bloods, are subject to taxation by and under the treaties and laws of the United States and the laws of Oklahoma."

The question is then presented, Did it cease to be taxable upon his death and the inheritance thereof by his full-blood Indian mother? There is no treaty to that effect between the Cherokee Tribe of Indians and the United States government, and there is no federal law exempting it from taxation. The fact that a full-blood Indian heir of the allottee may not convey the land, without the approval of the court having jurisdiction of the settlement of the estate of the deceased allottee in no wise operates to deprive the state of its constitutional right to impose taxes upon the land, in the absence of a federal statute or treaty.

To give the Marcy decision the effect contended for by the plaintiff would be to hold that the constitutional power to tax this land was defeated, not by any treaty providing for tax exemption or by any federal law providing for tax exemption, but by a federal restriction upon the right of alienation of the land after the land had become subject to taxation by virtue of specific authorization under a federal act. We can agree with no such contention.

When the restrictions upon the alienation of this land expired by the terms of the act imposing restrictions, the land was subject to the provisions of section 4 of the Act of May 27, 1908, and subject to taxation. It remained subject to taxation dur-

ing the lifetime of the allottee, and the death of the allottee did not operate to defeat the right of the state to subject the property to taxation, even though the full-blood Indian heir could not thereafter convey the land without the approval of the county court, a question not herein determined. The power of the state to tax this land during the lifetime of the allottee was not defeated by the death of the allottee, and the full-blood Indian heir took the land by inheritance with no right of exemption from taxation, but subject to the continued right of the state to tax the same.

While the Supreme Court of the United States, in Choate v. Trapp, 224 U. S. 665, 56 L. Ed. 941, held that exemption from taxation was a vested property right which could not be abrogated by statute, there was then under consideration the rights of the Choctaw and Chickasaw Indians acquired under a treaty provision that the lands should not be taxable for a period of 21 years. There is no such treaty provision as to Cherokee Indians or their surplus allotments. In Gleason v. Wood, 224 U. S. 679, 56 L. Ed. 947, the Choctaw and Chickasaw treaty was likewise considered. In English v. Richardson, 224 U. S. 680, 56 L. Ed. 949, the right of exemption was upheld under treaty provision. The right of exemption from taxation under the Cherokee Treaty applies only to homesteads.

This court in Brader v. James, 49 Okla. 734, 154 Pac. 560, held:

"Congress, in the exercise of its constitutional authority, and while the guardianship relation over full-blood Indians continues, may impose restrictions on full-blood Indian heirs, requiring that conveyances by them of inherited allotted lands be approved by the Secretary of the Interior; and this, notwithstanding the restrictions imposed by prior legislation have expired by limitation, or by the death of the allottee."

That holding was sustained by the United States Supreme Court in 246 U. S. 88, 62 L. Ed. 591. There the land involved was the homestead of a full-blood Choctaw Indian. It was inalienable for a period of 21 years during the lifetime of the allottee. Upon the death of the allottee, October 27, 1905, the land became alienable in the hands of the full-blood Indian heir, but she did not attempt to sell it until after the Act of April 26, 1906, took effect. Under the provisions of that act her conveyance required the approval of the Secretary of the Interior. There was then in force no such provision as that contained in section 4 of the Act of May 27, 1908.

The decision of the Supreme Court of the United States in Parker v. Richard, 250 U. S. 235, 63 L. Ed. 954, follows the decision of this court in Marcy v. Board of Commissioners, supra, and United States v. Shock, Co. Treas., 187 Fed. 870. There, there was a full-blood Creek Indian allottee and a full-blood Creek Indian heir, and neither section 1 nor section 4 of the Act of May 27, 1908, was involved. In that case the court called attention to the fact that "The heir is a full-blood Indian, as was the allottee, and is regarded by the act as in need of protection, as was the allottee." That statement emphasizes the distinction between the facts in that case and the facts in the case at bar.

In United States v. Shock, supra, land of allottee enrolled as full-blood Creeks and the surplus allotment of three-quarters or more blood Creeks was involved. The language of that opinion, "All other interests in full-blood inherited lands on March 1, 1909, were taxable," indicates that land such as herein involved was not considered therein.

Moffett v. Conley, 63 Okla. 3, 163 Pac. 118, involved the land of a full-blood Creek Indian who died before receiving allotment. The same kind of estate was involved in Canfield v. Jack, 78 Okla. 127, 188 Pac. 1040. Cushing v. Whaley, 64 Okla. 1, 165 Pac. 135, involved an allotment selected by the allottee and made after his death and prior to April 26, 1906.

United States v. Bartlett, 235 U. S. 72, 59 L. Ed. 137, involved a surplus allotment of a three-quarter blood Creek Indian. The court therein held that the Act of May 27, 1908, did not operate to impose restrictions upon land, which restrictions had been theretofore removed. The allottee in the case at bar and the one in United States v. Bartlett, supra, were less than full-blood and their allotments were not affected by the passage of the Act of April 26, 1906. There were no restrictions thereon at the time the Act of May 27, 1908, took effect, and that act in no wise operated to impose restrictions on the land. It was unrestricted and subject to taxation in the hands of the original allottee, and being such, under the authority of Shaw, Auditor, v. Gibson-Zahniser Oil Corporation, 276 U. S. 575, 72 L. Ed. 709, Congress was without power to impose an exemption from taxation. In that case the Supreme Court of the United States said:

"Little need be said as to the power of the Secretary of the Interior to exempt the land and its uses from taxation. The power, if it exists, is one conferred by Congress, but neither it nor the Secretary has in

terms purported to make or authorize such an exemption.

"The Act of May 27, 1908, contains no express exemption from taxation of the proceeds of restricted lands, but section 4 expressly subjects land from which restrictions have been removed to state taxation. This section was adopted in response to representations that the revenue of the state of Oklahoma was insufficient for state purposes, that large areas of land within the state allotted to Indians were exempt from taxation as agencies of the federal government, and that Indian citizens were enjoying the benefit of local government without taxation. Report of the Senate Committee on Indian Affairs, S. Rep. No. 575, 60 Cong., 1st Sess.; Report of the House Committee on Indian Affairs, H. Rep. No. 1454, 60th Cong., 1st Sess.

"At the time of this legislation restrictions on some allotted lands had been removed by reason of the expiration of the restricted period. There were also allotments on behalf of allottees dying before allotment which, in the hands of their heirs, were unrestricted. See Marchie Tiger v. Western Invest. Co., 221 U. S. 286, 55 L. Ed. 738, 31 Sup. Ct. Rep. 578. It cannot be assumed that Congress, at a time when it was withdrawing allotted lands from their former exemption in order that Indian citizens might assume the just burdens of state taxation, intended to extend a tax exemption by implication. In any case the Secretary of the Interior has never, by rule or regulation or other action, purported to exempt such lands from state taxation. No such action is to be implied from his authorized action in restricting the power of the Indian grantee to alienate the land."

Our attention is called to no decision based on the state of facts herein presented holding to the contrary, although there are statements made in some of the decisions which seem to give effect to the contentions of the plaintiff. When those cases are analyzed, they are found to be based upon some treaty provision or federal act not applicable to the surplus land of a half-blood Cherokee Indian allottee after the expiration of the term of restrictions imposed thereon.

We conclude that Congress, by the provisions of section 1 of the Act of May 27, 1908, provided that the restrictions upon land such as is in question here should be removed; that any restrictions thereon were thereby removed, and that Congress further provided by the provisions of section 4 thereof that such land should be subject to taxation. Nowhere has Congress provided that such land should cease to be subject to taxation upon the death of the allottee and the inheritance by full-blood Indian heirs. In the absence of a treaty stipulation to that effect or a federal law to that effect, the land is subject to taxation under the provisions of the Constitution and laws of the State of Oklahoma.

The judgment of the trial court is reversed, and the cause is remanded to the trial court for further proceedings in accord herewith.

CLARK, V. C. J., and RILEY, HEFNER, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CULLISON, J., absent.